Filed 8/1/13

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CITIZENS BUSINESS BANK, | B239747 |
| Plaintiff, Cross-Defendant and Appellant, | (Los Angeles County Super. Ct. No. EC049983) |
| v. | |
| ALEXIS M. GEVORGIAN, as Trustee, etc., | |
| Defendant, Cross-Complainant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Donna Fields Goldstein, Judge.  Affirmed.

Frandzel Robins Bloom & Csato, Thomas M. Robins, Tricia L. Legittino, and Alan H. Fairley for Plaintiff, Cross-Defendant and Appellant Citizens Business Bank.

Julie A. Herzon, for Defendant, Cross-Complainant and Respondent Alexis Gevorgian, as Trustee, etc.

This case involves competing claims of lien priority between the seller of real property, which took back a security interest on property sold to a developer, and the bank which financed development of the project through a construction loan. The issue is whether the seller's agreement to subordinate its security interest to that of the bank is enforceable where the developer and the bank entered into a side agreement between themselves, to which the seller did not consent, about which it knew nothing, and which substantially impaired its security. We conclude that it is not. *(Gluskin v. Atlantic Savings and Loan Assn.* (1973) 32 Cal.App.3d 307, 314 *(Gluskin).*) The trial court so held. We shall affirm.

**FACTUAL AND PROCEDURAL SUMMARY**

We take our factual summary from the evidence presented at trial and the trial court's final statement of decision

*A. Background*

Alex M. Gevorgian is trustee of the AMG & Associates Retirement Trust (AMG). In April 2005, AMG entered into purchase agreements to buy three contiguous lots in the San Fernando Valley, each of which was improved with a detached single family house. AMG planned to obtain the necessary approvals to subdivide the lots and build 20 single family residential units. The transaction was not completed until April 2007, when AMG closed on two of the three properties. Gevorgian purchased the third lot himself the same month, using a $600,000 loan.

Before purchase of the lots closed, and with the consent of the sellers, AMG began securing entitlements to develop all three properties together as a "'small lot'" single family home division, under the City of Los Angeles Small Lot Subdivision ordinance. It eventually sought approval for high density development of 15 residences.[1] None of the documents submitted to the City demonstrated an intent to construct the project in phases.

---

[1] The City of Los Angeles approved a small lot subdivision tentative map, tentative vesting tract map, subdivider's statement and other relevant documents. The

In August 2006, even though it had not closed on its purchase of the lots, AMG entered into a purchase agreement to sell them, with entitlements, to Haig Engineering and Construction, Inc. (HEC) for $5,089,177. At that time, HEC was owned by defendant Hank Ghazarian. The HEC vice president was John Tatoulian. Under this purchase agreement, HEC was to make deposits toward the purchase price according to a specified schedule. AMG was to carry back a seller's note and deed of trust in the amount of $600,000. Eventually, HEC was no longer able to make the scheduled payments. In the meantime, AMG closed on its purchase of two lots.

In April 2007, AMG and HEC modified their agreement so that Tatoulian and Ghazarian would each purchase one lot individually. Gevorgian retained ownership of the third lot (4605 Riverton) until November 2007, when he transferred it to AMG.

In order to develop the project, HEC and Mike Ismail formed Riverton Villas, LLC (Riverton), which ultimately became the purchaser of all three lots. Gevorgian asked for, and reviewed, the operating agreement for Riverton, focusing on the capital contribution provisions. The operating agreement he was given provided that Ismail would invest $4.4 million in equity capital in Riverton. Tatoulian told Gevorgian that Ismail would provide the capital for the project, to be used to pay off existing liens on the property. Tatoulian also told Gevorgian that AMG would have to carry back $600,000 in the transaction. According to testimony by Ghazarian and Tatoulian, this was the plan until the "'last minute.'"

B. *Construction Loan Agreement (CLA)*

HEC sought construction financing from Citizens Business Bank (the Bank) through a construction loan agreement. After negotiations, a $6,315,000 loan to Riverton was approved. Ghazarian, Ismail and Tatoulian personally guaranteed the loan. During the negotiations, the Bank told Riverton that it wanted the project constructed in three phases of five homes each, rather than the original plan to construct all 15 homes at once.

---

homes to be built resembled townhouses because only one to six inches separated the planned structures.

The construction loan agreement between the Bank and Riverton is dated December 21, 2007, and the loan was payable in full on June 21, 2009.

C. *Subordination Agreement*

In December 2007, Tatoulian told Gevorgian that AMG would have to carry back a note of $1.4 million, rather than the original amount of $600,000, to enable the construction loan to close. Tatoulian also told Gevorgian that the Bank required AMG to subordinate its note and deed of trust to the note and deed of trust securing the CLA. Gevorgian asked Tatoulian for the construction loan documents to determine the safety of subordinating AMG's security. He testified that he wanted to be sure AMG was not subordinating to an unacceptable loan that would harm its position in the transaction. Gevorgian did not ask the Bank or the escrow company for any other documents.

Tatoulian provided Gevorgian unsigned copies of the CLA, the note and the deed of trust. These were obtained from First Decision Escrow, which was handling the escrow on the transaction. The sale of the land by AMG and the construction loan were structured to close together, all through an escrow on the lot at 4605 Riverton, which was the last lot retained by AMG. Tatoulian told Gevorgian that the transaction had to be structured to place the entire escrow on one piece of property so that the construction deed of trust and Gevorgian's deed of trust would be recorded at the same time. Gevorgian eventually agreed to this transaction, including the subordination of AMG's security. The trial court found the use of a subordination agreement to be commonplace for construction financing.

Verona Chion, the loan officer who handled this transaction for the Bank, testified that the Bank would not have made the loan to Riverton unless AMG agreed to the Subordination Agreement because that agreement ensured the Bank's first and prior lien. She testified that the Bank would not have given AMG copies of any of the loan documents unless Riverton authorized it to do so. Chion reviewed the Subordination Agreement for accuracy and to ensure that no terms, conditions, or restrictions were included in it. Riverton did not ask the Bank to provide any loan documents to AMG

4

before close of escrow.  The construction loan was approved by the Bank on December 18, 2007.

*D.  Letter of Understanding*

Gevorgian was not told that the Bank simultaneously had entered into a side agreement, letter of understanding (LOU), with Ghazarian, Tatoulian and Ismail.  The Bank prepared the LOU, which was reviewed by Chion.  Although dated December 21, 2007, the trial court found it was not executed until December 26, 2007.  Tatoulian had a copy of the LOU, as did the Bank.  Gevorgian and AMG were not informed about the LOU and had no knowledge of its existence.  Chion testified that the Bank did not give the LOU to AMG.

The trial court noted that Emily Ralles, the First Decision Escrow escrow officer for this transaction, testified that she had no recollection of having received the LOU, although two unsigned copies were found in the escrow file during discovery.  While Ralles notarized signatures by Ghazarian and Ismail on the note and deed of trust, the LOU signatures were not notarized.[2]  She did not recall being present when the LOU was signed.

The trial court found that the terms of the LOU contradict the terms of the CLA in several respects.  The CLA provides that loan funds shall be used only for constructing and equipping the project.  In contrast, the LOU provides for an immediate disbursement of $2.2 million to be used to repay existing liens (termed the "land draw" by the parties and court).  The CLA defines the project as "the construction and completion of all improvements contemplated by this Agreement, including the construction of 15 single family residences."  The LOU defined the project as:  "The project will consist of three Phases with 5 units in each Phase."  (We refer to this requirement as the "phasing" requirement.)  The LOU states that the release of funds for Phase 2 would be contingent upon the closed sale of 3 units from Phase 1.  The release of funds for Phase 3 would be

---

[2] The court noted that an undated copy of the LOU without exhibits, and not signed by lender, was produced during discovery from the First Decision Escrow files.

contingent on the closed sale of 3 units from Phase 2 and the remaining 2 units of Phase 1. The LOU also allows two 90-day extensions of the construction loan, a term not found in the CLA.

Disbursement provisions of the LOU conflict with the provisions of the CLA. The CLA enumerated 21 conditions precedent to each advance of loan funds. These included acceptance of a complete set of written plans and specifications, with copies of all permits and requisite approvals necessary for the project, including evidence of valid zoning. The CLA states that "Borrower [Riverton] shall apply only for disbursement with respect to work actually done by the General Contractor and for materials and equipment actually incorporated into the Project." Paragraph 19 of the LOU provides: "Funding to be limited to 50% of land value until the final map is recorded."

The Bank and AMG recorded their deeds of trust on January 2, 2008, and escrow closed on January 3, 2008.

*E. Events after Escrow Closed*

AMG argued at trial, and on appeal, that the Bank funded the construction loan with a $2.2 million wire transfer on December 31, 2007, although the conditions precedent to such a disbursement had not been fulfilled at that time. Although the CLA conditioned disbursement of loan funds on final governmental approvals, the $2.2 million was disbursed before these were obtained. The City issued a letter of correction requiring changes to the tract map on May 29, 2008. The final subdivision map was recorded in July 2008. Riverton paid for permits for construction of three houses on September 4, 2008.

In December 2008, the Bank had another appraisal of the project conducted. Chion met with the Riverton principals in January 2009 about her concern that Riverton was still submitting requests to draw from the loan despite a lack of construction progress after several months. The Bank wanted to get a better idea of how Riverton intended to finish the project, or whether the project would be completed. Chion discussed shoring up the loan with additional cash infusions or collateral, but it was decided that it was unnecessary at that time. The Bank asked for a specific breakdown of the phases because

6

it was concerned that there were not enough loan funds remaining to finish the first phase of constructoin. Ghazarian created a budget to complete phase 1 and continue on with phases 2 and 3.

On February 10, 2009, Chion sent an email to Riverton stating that she would not fund any more draw requests until construction progressed at an acceptable pace and financials were updated. But Exhibit 265 shows that the Bank funded disbursements after February 10, 2009. Chion said this was to pay subcontractors and third party suppliers for work which the Bank had verified had been done, to avoid liens on the property.

In February 2009, Tatoulian called Chion to let her know that HEC had filed for bankruptcy because of trouble on other projects. Construction on the project stopped at this point. At a meeting of Chion, Tatoulian, Ghazarian, Ismail and others, Ghazarian said he wanted to finish the project and thought he could finish the first three homes in the first phase within a couple of months and the remaining two homes in phase one in another few months. Ismail expressed concern to Chion about allowing Ghazarian to finish the project and solicited contractors to finish it himself.

The Bank did not continue with construction of the project. It obtained a receiver to secure the site and inventory and moved forward with collection efforts. It declared the construction loan in default because construction had stopped and Riverton did not continue with construction.

F. *Procedural Summary*

On May 15, 2009, the Bank sued Riverton, Ghazarian, Ismail, Tatoulian, and Gevorgian, as trustee of AMG.[3] Ghazarian was granted a discharge in his personal Chapter 7 bankruptcy and the Bank filed a request for dismissal without prejudice as to him. The trial court granted the Bank's motion for summary judgment against Ismail and

---

[3] The complaint alleged causes of action for judicial foreclosure, specific performance to enforce the deed of trust and appoint a receiver, breach of contract, and for breach of the guarantees executed by Ghazarian, Ismail, and Tatoulian.

Tatoulian and judgment was entered against them on the Bank's complaint. The Bank dismissed its first cause of action against Riverton without prejudice. The parties agreed to a stipulated judgment against Riverton and in favor of the Bank on the second cause of action for appointment of the receiver. This resolved the Bank's only cause of action against Riverton.[4] AMG answered the Bank's complaint.

Gevorgian, as trustee for AMG, cross-complained against the Bank and Riverton seeking a declaration of the relative priorities of the Bank's and AMG's deeds of trust, and to enjoin the Bank from foreclosing on the property.[5] A first amended cross-complaint by AMG added a cause of action for judicial foreclosure of AMG's deed of trust against the Bank and Riverton. The Bank unsuccessfully sought summary judgment on the cross-complaint.

A bench trial on AMG's cross-complaint was held between January 4 and January 27, 2011. Counsel for Ismail appeared on behalf of Riverton and agreed that Riverton would not put on a defense, but was not defaulting. It did not contest any factual allegations sworn to by any of the witnesses.

The parties filed post-trial briefs and the trial court issued a tentative statement of decision. The Bank requested a statement of decision on additional issues and objected to portions of the tentative statement of decision. AMG filed a written response to each objection. After a hearing on the Bank's objections, the trial court issued its final statement of decision.

The court found it was undisputed that Gevorgian and AMG were not informed of the LOU and had no knowledge of its existence. The court also found that Gevorgian

---

[4] Riverton and Ismail filed a cross-complaint, then first amended cross-complaint, alleging breach of fiduciary duty, fraud, breach of contract, accounting and conversion against Ghazarian and Tatoulian, and negligence against the Bank. A second amended cross-complaint followed. The Bank successfully demurred and was dismissed from the second amended cross-complaint.

[5] We refer to AMG as the party because Gevorgian acted on its behalf as trustee in the cross-actions.

8

and AMG "had no reason to believe that a LOU was in effect between [the Bank] and Riverton and its principals." The court credited Gevorgian's testimony that in his many years of experience in construction lending, he had never seen a LOU between a bank and borrower that was not contained as part of a construction loan agreement, nor one that contained terms contradicting a loan agreement. Both banking experts testified to how unusual it is to have a side LOU not referenced in a construction loan agreement. The court found that Gevorgian was not negligent in failing to inquire as to the existence of a LOU because he had no reason to do so.

The court expressly found the terms of the LOU made material modifications of the CLA about which AMG should have been notified. It concluded that these modifications placed AMG's subordinated lien at greater risk in several respects. Since the LOU allowed an immediate disbursement of $2.2 million to pay off existing loans, an obligation to make interest payments was created from the beginning of the loan. If AMG had been advised of this payment, it would have been alerted that Riverton, Ghazarian, and Ismail did not have money of their own in the project, contrary to the terms of the operating agreement for Riverton which was shown to Gevorgian. AMG was never notified of the last minute change which relieved the Riverton principals from investing cash in the project. Based on the testimony of Gevorgian, and expert witnesses Tom Malkasian and Gary Curtis, the trial court found this fact increased the risk of default. Credible evidence was found by the trial court that the phasing of the project was inefficient, and increased both the time and cost necessary to complete it. It also created greater risk to AMG's security.

The court found that the Bank created both the CLA and LOU but neither document made any reference to the other. It found that the LOU should have been provided to Gevorgian when he asked for the construction loan documents before agreeing to subordinate AMG's security interest. The court expressly credited Gevorgian's testimony that had he been advised of the LOU, he would not have entered into the Subordination Agreement.

9

Alternatively, the court found that the Bank made advances and disbursements to Riverton in violation of the terms of both the CLA and LOU.[6] Specifically, it "knowingly made advances/and disbursements for things, and at times that were prohibited by either the CLA or the LOU". (AA 587-588)~ It also found that AMG was not notified of any of these deviations from the CLA or LOU and was unaware of them.

The court concluded that the CLA was dated and effective on December 21, 2007, before the LOU was executed on December 26, 2007, and the LOU modified the CLA regardless of when they were actually signed. Since the LOU modified the CLA, the Bank "had an obligation to notify and secure the consent of AMG because the modifications materially affected AMG's security and made it riskier," and to assure that AMG was provided both the CLA and the LOU since it drafted both documents and knew they were contradictory in material parts. Since the Bank required the Subordination Agreement as a condition of the construction loan, it knew of AMG's subordinated position and that the CLA was contradicted by the LOU. Citing *Gluskin*, *supra*, 32 Cal.App.3d 307, the court concluded the Bank "had a duty to AMG not to enter into a course of conduct with Riverton and the others the effect of which could destroy the seller's interest".

The court found AMG was provided only an abrogated CLA, which was superseded by the LOU and that the LOU was never given AMG. "This would constitute a case of fraud on AMG by Riverton and the other defendants. But in light of the fact that [the Bank] knowingly caused this circumstance by producing substantially contradictory documents, [the Bank] should have known that this would happen. [The Bank] can not benefit from such deceit or negligence."

The court rejected the Bank's argument that AMG could not rescind the Subordination Agreement because it had relied on it as third party beneficiary. It found AMG was the only party prejudiced through no fault of its own. The court held: "It is

---

[6] The court concluded that AMG waived any claim for Riverton's inappropriate use of funds disbursed by the Bank.

settled law that a third party beneficiary can not assert greater rights than the promisee, here Riverton, even if the third party is a creditor," citing authority to that effect.

The court also rejected the Bank's argument that AMG had released it from all obligations with respect to disbursements under the terms of the Subordination Agreement. The court concluded that the Bank was not entitled to equitable relief because it was "inexcusably negligent and that to grant an equitable lien would cause an injustice to AMG." Based on these findings of fact and conclusions of law, the court abrogated the priority of the Bank's lien and declared it unenforceable against AMG, which was declared to have a superior lien. It granted judicial foreclosure on AMG's deed of trust.

The initial judgment in favor of AMG on the first cause action against the Bank and Riverton for declaratory relief was entered on January 13, 2012. AMG's deed of trust was given first priority above the Bank or Riverton, including the construction loan deed of trust. The Subordination Agreement was declared unenforceable. Riverton was found in breach of the note obligating it to pay AMG $1,400,000 plus interest at 10 percent from December 26, 2007. AMG was awarded a money judgment of $1,400,000 plus prejudgment interest, costs and expenses of collection, and attorney's fees.[7] AMG was awarded $210,736.05 in reasonable attorney fees and $52,392.96 in costs against Riverton. On its cause of action for judicial foreclosure, AMG was found entitled to judicially foreclose on its lien under the deed of trust. The Bank and Riverton were barred from any rights in the property. AMG was allowed to become the purchaser at the foreclosure sale, and was allowed to bid the amount due it from Riverton. AMG waived any deficiency judgment against Riverton. AMG was awarded judgment in its favor on the Bank's complaint against it, and was awarded $11,484.90 in costs as the prevailing party.

---

[7] Interest of $703,682 plus $562 per day from March 30, 2012 until the date judgment was entered was awarded to AMG.

The Bank filed its notice of appeal from the initial judgment on March 9, 2012. The final judgment was entered on April 16, 2012.[8]

## DISCUSSION

### I

On review of a judgment based upon a statement of decision following a bench trial, we resolve any conflict in the evidence and reasonable inferences to be drawn from the facts in support of the determination of the trial court. (*Axis Surplus Ins. Co. v. Reinoso* (2012) 208 Cal.App.4th 181, 189.) Where there is a challenge to the sufficiency of the evidence supporting the judgment, we "'"''consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings]. [Citations.]' [Citation.] We may not reweigh the evidence and are bound by the trial court's credibility determinations. [Citations.] Moreover, findings of fact are liberally construed to support the judgment. [Citation.]"' [Citations.]" (*Ibid.*) "'The substantial evidence [standard of review] applies to both express and implied findings of fact made by the superior court in its statement of decision rendered after a nonjury trial.' [Citation.]" (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 958.) "The testimony of a single

_____

[8] The copy of the judgment filed that date in the record on appeal has a hand-written notation stating that it was ordered stricken by the Court on 3/13/12. In its Civil Case Information Statement filed with this court, counsel for Bank acknowledged that the January 13, 2012 judgment had been stricken. Counsel stated the belief that the new judgment would be substantively the same, and would be modified only to include the amounts awarded for prejudgment interest, fees, and costs. No new notice of appeal from that judgment is in the record on appeal. Notice of entry of judgment was mailed by counsel for AMG on the same day. AMG argues that Bank appealed from a void judgment because it was superseded by the final judgment entered in April 2012. We exercise our discretion to treat the premature notice of appeal as filed immediately after entry of the later judgment. (*Village Nurseries, L.P. v. Greenbaum* (2002) 101 Cal.App.4th 26, 36 [appeal taken from judgment superseded by amended judgment treated as filed from the amended judgment.].)

12

witness may be sufficient to constitute substantial evidence. [Citation.]" (*Lui v. City and County of San Francisco* (2012) 211 Cal.App.4th 962, 969.)

The case presents mixed questions of law and fact. "'Mixed questions of law and fact concern the application of the rule to the facts and the consequent determination whether the rule is satisfied.' [Citation.]" (*General Mills, Inc. v. Franchise Tax Bd.* (2012) 208 Cal.App.4th 1290, 1302.) "Our standard of review on a mixed question of fact and law depends on the type of inquiry involved. 'If the pertinent inquiry requires application of experience with human affairs, the question is predominantly factual and its determination is reviewed under the substantial-evidence test. If, by contrast, the inquiry requires a critical consideration, in a factual context, of legal principles and their underlying values, the question is predominantly legal and its determination is reviewed independently. [Citation.]' (*Crocker* [*National Bank v. City and County of San Francisco* (1989)] 49 Cal.3d [881,] 888; see *Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 800–801.)" (*General Mills, Inc. v. Franchise Tax Bd.*, *supra*, at pp. 1302–1303.)

"'The interpretation of a written instrument, even though it involves what might properly be called questions of fact . . . is essentially a judicial function to be exercised according to the generally accepted canons of interpretation so that the purposes of the instrument may be given effect.' (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865.) An appellate court reviews such instruments independently, 'unless the interpretation turns upon the credibility of extrinsic evidence.' [Citations.]" (*PV Little Italy, LLC v. MetroWork Condominium Assn.* (2012) 210 Cal.App.4th 132, 144–145.)


II

Under a subordination agreement, a party agrees to subordinate the priority of its lien to that of another. (*Bratcher v. Buckner* (2001) 90 Cal.App.4th 1177, 1185.) The agreement must be interpreted to enforce the objective intent of the parties. (*Id*. at p. 1186.) Under Civil Code section 2898, a purchase money deed of trust has priority over other liens on real property, but financial institutions may choose not to lend money on the security of real property unless their lien is in first position. (*Brown v. Boren*

(1999) 74 Cal.App.4th 1303, 1314 (*Brown*), quoting *Middlebrook-Anderson Co. v. Southwest Sav. & Loan Assn.* (1971) 18 Cal.App.3d 1023, 1029–1030 (*Middlebrook*).) For this reason, subordination agreements are commonly used when construction loans are made on property on which there is a prior purchase money deed of trust.

AMG's case against the Bank, and the judgment in its favor, are based on a line of authority established in *Handy v. Gordon* (1967) 65 Cal.2d 578 (*Handy*), *Middlebrook*, *supra*, 18 Cal.App.3d 1023 and in *Gluskin*, *supra*, 32 Cal.App.3d 307. We begin our analysis with the principles articulated in those cases.

A. *Handy, Middlebrook and Gluskin*

*Middlebrook* involved the sale of real property to developers, to be paid partially by a purchase money deed of trust which was to be junior to a construction loan to be obtained at some later time by the developers. The arrangement in *Middlebrook* was for subordination by recording priority rather than the type of express subordination agreement at issue here. (*Middlebrook*, *supra*, 18 Cal.App.3d at p. 1026.) The lender allowed the developers to use $300,000 for purposes other than construction improvements. Loan funds ran out and the developers abandoned the unfinished project. The lender purchased the property at a series of foreclosure sales. The sellers' action against the lender was based on its failure to limit the use of loan funds to construction purposes, in violation of conditions of the construction loan on which sellers relied in agreeing to subordinate. Sellers argued that the subordination should be voided because the conditions of the loan were violated. (*Id.* at pp. 1027–1028, 1031.)

In *Middlebrook*, the court concluded "that the duties owed by a lender to a seller under a formal subordination agreement do not differ from the duties owed by a lender to a seller when the lender obtains priority over the seller under an agreement by the seller to record after the lender." (*Middlebrook*, *supra*, 18 Cal.App.3d at p. 1029.) *Middlebrook* relied upon the strong public policy reasons to protect the subordinating seller, identified by the Supreme Court in *Handy*, *supra*, 65 Cal.2d 578. (*Middlebrook*, *supra*, 18 Cal.App.3d at pp. 1036–1037.) The *Handy* court warned that without express limits and protections incorporated into the subordination agreement, a subordinating

14

seller "is forced to rely entirely on the buyer's good faith and ability as a developer to insure that he will not lose both his land and the purchase price." (Handy, at p. 581.) It concluded that "[s]uch a contract is not as to them 'just and reasonable' within the meaning of Civil Code section 3391.'" (*Id*. at p. 582.)

With these principles in mind, the *Middlebrook* court turned to the duty of a lender to a seller where the seller has subordinated its loan. "[T]he lender is by far in the better position to control the use of the loan proceeds and thereby prevent misappropriations by the developer. The lender can require documented evidence that expenses have been incurred and can corroborate this by on-site inspections. It is common for lenders to control disbursements, since they, too, have an interest in preventing misuse of loan proceeds. [Citation.]" (*Middlebrook*, *supra*, 18 Cal.App.3d at pp. 1036–1037.) It also concluded the lender is in a far better position to absorb any loss. (*Id*. at p. 1037.)

The court found equitable support to imply an agreement by the lender to control disbursements from the lender's actual knowledge of the provisions of the seller's lien and the subordination agreement. (*Middlebrook*, *supra*, 18 Cal.App.3d at p. 1037.) In that case, with full knowledge of the subordination, the lender disbursed loan funds without limitation. (*Ibid.*) The court concluded that: "the actions of the parties here, if proved as alleged, did create a subordination agreement, and the lender's failure to protect seller's security interest gives seller a cause of action . . . ." (*Id*. at pp. 1037–1038.)

*Middlebrook* was followed by *Gluskin*, *supra*, 32 Cal.App.3d 307. In that case, the seller sold land to a buyer in return for a note secured by a deed of trust. The deed of trust provided that it was subordinate to two trust deeds by a construction lender which were to be recorded concurrently. The seller's deed of trust stated that the seller understood the construction loans were issued in reliance on the agreement to subordinate. It also provided that the seller had knowledge of, and approved and consented to provisions of the loan agreement between the buyer and the construction lender. The seller was to receive 50 percent of profits from the construction and sale of homes to be built on the property. Disbursements were to be made first for amounts to

15

carry the land; second to pay the seller the balance on its deed of trust; third to repay the buyer for advanced funds; and finally profits were to be split equally under certain conditions. A lawyer with substantial experience in real estate development represented the seller in its dealings with the buyer. The seller and buyer previously had entered into a separate joint venture in the same general area.

The buyer in *Gluskin* obtained two 30-year construction loans from the lender to construct single family residences. The escrow instructions provided that in disbursing the loan proceeds, the lender had no obligation or duty to see to their application by the buyer/developer and that any diversion of funds by the developer would not defeat the subordination agreement. Poor housing market conditions arose. The lender and buyer modified the note in what the trial court found to be "a substantial and drastic manner." (*Gluskin, supra,* 32 Cal.App.3d at p. 312.) The principal amount was reduced from nearly $2.5 million to $712,530; the interest rate was raised from 5 ¼ to 10 percent; the monthly payments were reduced to $5,900 and the maturity of the note was shortened from 30 years to 10 months. (*Id.* at pp. 309–312.) The buyer ultimately defaulted and the lender purchased the property at a foreclosure sale. (*Id*. at p. 312.) The seller brought an action for declaratory relief seeking a judgment that its lien on the property was prior to and superior to the construction loans. The trial court entered judgment for the lender. (*Id*. at pp. 309, 312.)

The *Gluskin* court expressly agreed with the principles of law as stated in *Middlebrook*. (*Gluskin*, *supra*, 32 Cal.App.3d at p. 313.) It recognized the vulnerable position of a seller who agrees to subordinate a purchase money deed of trust. (*Ibid.*) It cited the strong public policy reasons to protect the subordinating seller in such situations, explicated by the courts in *Middlebrook*, 18 Cal.App.3d at p. 1036 and *Handy*, *supra*, 65 Cal.2d at p. 581. (*Gluskin*, at p. 313)

Unlike the situation in *Middlebrook*, the seller in *Gluskin* had expressly waived any rights to require the lender to supervise or control the application of the loan funds by the buyer. (*Gluskin*, *supra*, 32 Cal.App.3d at p. 313.) In light of that waiver, the *Gluskin* court held that any duty by the lender to protect the subordinating seller's security

16

interests had to be based on considerations other than those identified in *Middlebrook* and other cases in which the lender had either an express or implied duty to the seller to see to the proper application of loan funds. (*Id*. at p. 314.) The *Gluskin* court found those considerations in public policy "which requires protection of subordinating sellers and that a lender and a borrower may not bilaterally make a material modification in the loan to which the seller has subordinated, without the knowledge and consent of the seller to that modification, if the modification materially affects the seller's rights." (*Ibid.*) "[I]t is of course a question of fact whether the modification materially affected the rights of the subordinated seller." (*Id*. at p. 315.)

*Gluskin* held that if a lender and a buyer agree between themselves to destroy the seller's interest, the seller is entitled to secure relief either upon the ground of fraud or under the covenant of good faith and fair dealing. (*Gluskin*, *supra*, 32 Cal.App.3d at p. 315.) "The absence of malevolent purpose does not itself immunize the buyer and the lender. If however innocently, their bilateral agreement or conduct so modifies the terms of the senior loan that the risk that it will become a subject of default is materially increased, then the buyer and the lender may subject themselves to liability to the seller if they proceed without the latter's consent, and if the seller's otherwise junior loan is to be adversely affected." (*Ibid.*)

The representative of the seller in *Gluskin* testified that he did not consent to the modifications of the construction loan and would not have done so if given the opportunity. (*Gluskin*, *supra*, 32 Cal.App.3d at p. 317.) The court concluded that the decision to postpone construction, coupled with the drastic shortening of the term and the very large balloon payment due at the end of that term, clearly enhanced the likelihood of a default by the buyer and the consequent foreclosure. (*Ibid.*) The judgment for the lender was reversed. (*Id*. at p. 318.)

B. *Application*

We agree with AMG that substantial evidence supports the trial court's finding that the LOU made material modifications to the CLA without the knowledge of AMG,

17

that these modifications materially impaired AMG's security, and that, as a result, the Bank is not entitled to priority over AMG's deed of trust.

### 1. AMG Subordinates Its Loan While Unaware of LOU

Gevorgian testified that he asked to see the CLA, the promissory note, and the deed of trust. He testified that he did not ask for any other documents because "those are the primary operative agreements for a construction loan." In reviewing the CLA, he focused on the maturity date, the total dollar amount, the use of funds, and the preconditions for each advance of loan funds. Gevorgian explained that "[t]hose are the areas that were most important to me from my perspective, and . . . *because I was going to be subordinating, I wanted to make sure I wasn't subordinating to a loan that wasn't acceptable to me, that was unfair to the borrower which would put me in a harm position, potentially harming position.*" (Italics added.) He read the Subordination Agreement when he received it, and signed it on December 29, 2007. Gevorgian testified that he never saw the LOU before the close of escrow nor before this action was filed. He did not know that the Bank was advancing loan funds to pay off existing liens on the lots; he believed that those liens were being paid off by the borrowers. He was not informed that the Bank had required that construction occur in phases.

Gevorgian testified that he "[a]bsolutely" would not have agreed to subordinate his trust deed if he had known the project was going to be built in phases. He explained that he would not have agreed to subordinate if he had been shown the LOU, because it created "a much higher degree of risk to me, in terms of repayment of my debt." Gevorgian had experience in construction loans with Bank of California and Bank One. He worked on 40 land acquisition projects as an employee of Kaufman and Broad, which included involvement in the construction loans. In his experience both at banks and in reviewing loan documents in various real estate projects, Gevorgian had never seen a separate side letter agreement that contained loan terms that was not either attached to, or referenced in, the construction loan agreement. Nor had he seen an instance where there was a side letter agreement that contradicted terms of the construction loan agreement where the side agreement was not called an amendment or modification.

18

Based on the testimony of Tom Malkasian, AMG's banking expert witness, the court found that the custom and practice in the banking community in Los Angeles is not to prepare side LOUs. It found: "Rather it is the custom and practice . . . that the terms of the construction loan be documented in one document, a CLA, and that any addend[a] or amendments thereto at the time of the loan, be referenced in or attached to the CLA."[9] Malkasian said that any terms different from those in the construction loan agreement would be included in a modification of that agreement, the note, and the deed of trust. In his 28 years of construction lending experience, Malkasian had not seen a side agreement that was not referenced in the construction loan agreement itself.

The testimony of Gregory Rickard, the Bank's expert witness on banking practices in construction loans, was similar. He had seen side letter documents as part of a loan package times 6 times in his 20 years in construction lending. There was no consistent method as to how they were incorporated into the loan documents. Each of these occasions "involved workout situations where the transactions had become troubled and the borrowers were contesting aspects of the transaction ranging from the loan documentation to restructure proposals to dollars that they needed to complete the project." He never had used a side letter himself; all the transactions he originated involved customized documentation. He testified that the use of side agreements was within the custom and practice in southern California banking community to document a transaction involving form documents because of the limitations inherent in drafting the forms.[10] Rickard also testified that bankers prefer not to allow subordinated debt in their transactions.

---

[9] In so finding, the trial court expressly noted the testimony of Chion, the Bank's loan officer, that it is the Bank's practice to prepare a side LOU with every construction loan.

[10] We infer that this is a reference to the use of standard computer software to draft construction loan agreements and related documents. Trial testimony established that these programs do not have the ability to include customized terms of an agreement in some situations.

Chion testified that the LOU was a separate side agreement because the computer software used to generate the CLA, LaserPro, could not be modified to reflect the terms of the LOU. Malkasian contradicted that testimony, saying that if a loan requires phasing, or payments before construction that cannot be inserted in loan documents generated by LaserPro, the custom is to prepare a completely individual CLA with all the terms contained in that single document. The banking standard requires a budget, any phasing requirement, release prices and equity contributions of the borrower to be in the CLA. But in this case, all of these are in the LOU instead.

The trial court questioned Rickard as to whether he expected a subordinating seller to be provided key loan documents before signing a subordination agreement. He said he expected that the subordinating party would obtain the key loan documents directly or indirectly. Rickard identified the key documents in this transaction as the note, the deed of trust, the CLA, and the LOU. He acknowledged that the LOU is not cross-referenced in the CLA. In his view, although the LOU is not a stand-alone construction loan agreement, it "does supplement the terms of the transaction."

## 2. Material Modifications

We have examined the CLA and LOU. As the trial court found, the LOU substantially contradicted the CLA in ways that increased the risk to AMG. Although the agreement memorialized in the CLA contemplated that the construction loan would be used for construction purposes only, the LOU allowed the immediate release of $2.2 million to pay off existing liens on the properties. This obligated Riverton to begin making interest payments immediately. More significantly, this disbursement was used for portions of the purchase price, which AMG originally was told would be covered by Ismail's contribution of $4.4 million in equity. At the last moment the deal was changed so that Ismail made no equity contribution. This change in the LOU signified that none of the Riverton principals had significant money of his own in the project since Gehzarian and Tatoulian had financed the purchase of two of the lots with loans paid off with the construction loan. AMG was not told of this last-minute change. In addition,

the LOU substantially changed the plan for construction, from building all 15 units at one time, to three phases of 5 units each.

The trial court asked Malkasian to review the CLA and LOU to determine whether essential terms of the loan appeared in the LOU but not the CLA. He identified phasing of construction, the loan budget, release prices for the units, and the equity requirement for Riverton as terms appearing only in the LOU. When asked, Rickard identified the budget and phasing requirement as two essential elements of the loan that were in the LOU but not the CLA.

### 3. Impairment of AMG's Security Interest

The trial court relied on Malkasian's testimony that lack of borrower cash equity and phasing were primary factors which cause greater risk in a construction loan. He explained that the use of the $2.2 million land draw from loan funds to pay existing liens through escrow reduced the amount of cash equity put into the project by Riverton or its principals. As previously discussed, AMG was told that cash contributions by Ismail would be used to pay off the existing liens, rather than loan funds. According to Malkasian, the risk of the transaction increased due to the phasing requirement and the structure of the loan in the LOU, in part because the construction budget did not address phasing.[11]

The court also cited the testimony of Gary Curtis, AMG's expert witness on real estate appraisal. Curtis testified that the LOU requirement that the project be constructed in 3 phases increased the costs of construction by 15 percent and increased the time of construction. He never recommends phasing a small project such as this because all expenditures are up front and profits are on the back end. Where, as here, the developer borrows money for construction with little equity, holding costs go up because of interest due on the increased amount of borrowed money.

---

[11] Malkasian said that generally it does not pay to phase projects smaller than 30 units. He explained that this is because the amount of infrastructure costs and land advance, together with the necessity of building and selling the units quickly, far outweighs the benefit of phasing.

*C. Bank's Arguments*

  *1. Gluskin Theory*

    *a. That Gluskin is Inapplicable*

In an argument raised for the first time in its reply brief, the Bank argues that AMG was not a true subordinating seller because when Riverton purchased the three lots, two of them were owned by Ghazarian and Tatoulian. The argument is forfeited. (*Cates v. Chiang* (2013) 213 Cal.App.4th 791, 814 [issue forfeited because party deprived opponent of opportunity to respond by raising argument only in reply brief].)

In any event, the argument is not well taken. Gevorgian testified that the Bank's loan was processed through an escrow for 4605 Riverton, the lot owned by AMG only. Tatoulian told Gevorgian that this was the way the Riverton principals wanted the transaction structured. The Subordination Agreement by which AMG carried back a loan for $1.4 million was processed through the same escrow. The trial exhibits also reflect that the escrow was for 4605 Riverton, the AMG lot. We are satisfied that AMG was a subordinating seller within the meaning of *Gluskin*.

    *b. Express Waivers in Subordination Agreement*

The Bank argues: "The trial court's reliance on *Gluskin* for the existence of an implied duty was also wholly erroneous. As recognized in *Swiss Property Management* [*Co. v. Southern Cal. IBEW-NECA Pension Plan* (1997)] 60 Cal.App.4th [839,] 846–847 [*Swiss Property*], *Gluskin*, in fact, **rejected** any notion that there was an implied obligation to ensure loan proceeds were disbursed for a 'proper purpose' given the express waivers in the agreement before it. *Gluskin*, 32 Cal.App.3d at 314."

This argument ignores the basis for the *Gluskin* holding, that although the seller waived any contractual duty by the lender under the subordination agreement, such a duty was imposed under the public policies we have discussed. *Swiss Property* is distinguishable. The subordination agreement in that case was contrary to a prior rider to the deed of trust between seller and buyer, which limited the principal to be secured by the construction loans, required loan funds to be used solely for development of the property, and limited the interest rate. But the subordinating seller was aware of the

22

terms of both the rider and the subordination agreement. In our case, while AMG was a party to the Subordination Agreement, it was unaware of the LOU.

Significantly, the *Swiss Property* court found *Gluskin* inapplicable because the only claimed modification was a six-month extension of the loan term, which the court found was not material. (*Swiss Property*, *supra*, 60 Cal.App.4th at p. 847.) The court found no evidence that this extension adversely affected the sellers' rights or the value of their security. (*Ibid.*) In contrast, the modifications made by the LOU were material and adversely affected AMG's rights.

### c. Public Policy Rationale of Gluskin

As to the public policy basis for the *Gluskin* ruling, the Bank argues that the terms of the LOU were part of the loan *before* the Subordination Agreement was signed, not after. Based on this, the Bank argues that the *Gluskin* theory applies only to post-subordination modifications to a loan. As the trial court found, the CLA provides it was effective as of December 21, 2007. Trial exhibit No. 308 is a copy of the LOU executed by Ghazarian and Ismail on December 26, 2007. Gevorgian signed the Subordination Agreement on December 29, 2007.

More specifically, the Bank's argument disregards the basic premise of the *Gluskin* rationale: that the subordinating seller did not *consent* to modification of the loan agreement by the lender and borrower. In *Gluskin*, those modifications were made after the subordination agreement was executed. (*Gluskin*, *supra*, 32 Cal.App.3d at p. 312.) But the focus of the *Gluskin* court was on lack of consent. The court identified "public policy which requires protection of subordinating sellers and that a lender and a borrower may not bilaterally make a material modification to a loan to which a seller has subordinated, *without the knowledge and consent of the seller to that modification*, if that modification materially affects the seller's rights." (*Id.* at p. 314, italics added.) The court again phrased the issue as one of consent: "If dispute results from an *unconsented* to modification it is of course a question of fact whether the modification materially affected the rights of the subordinated seller." (*Id.* at p. 315, italics added.)

23

The lack of consent by the seller was addressed once more by the *Gluskin* court in discussing the imposition of a duty on an innocent lender: "If, however innocently, [a buyer and lender bilateral agreement] or conduct so modifies the terms of the senior loan that the risk that it will become a subject of default is materially increased, then the buyer and the lender may subject themselves to liability to the seller *if they proceed without the latter's consent*, and if the seller's otherwise junior loan is to be adversely affected." (*Gluskin, supra*, 32 Cal.App.3d at p. 315, italics added.)

The evidence here is that AMG did not consent to the modifications of the CLA made by the LOU. We conclude that the public policies identified in *Gluskin* apply with equal force to this case, even if the LOU was executed before the Subordination Agreement. The key is that the Bank and buyers entered into the LOU without AMG's knowledge and consent.

The Bank's next challenge to imposition of a duty under *Gluskin* is that the lender in that case must have known that the seller's consent was never sought or obtained, and that there is no evidence of such knowledge here. We find no basis to read this requirement into *Gluskin*. As we have seen, *Gluskin* imposes a duty on a lender even where "innocently" a bilateral agreement or conduct modifies the loan without the consent of the subordinating seller to the impairment of the subordinated security. (*Gluskin*, *supra*, 32 Cal.App.3d at p. 315.) The *Gluskin* court noted that the seller did not claim that the lender had committed fraud.[12] (*Id*. at p. 315, fn. 8.)

The Bank also argues there was no legal or factual basis to impose a duty to ensure that AMG knew about the Subordination Agreement. It challenges the trial court's conclusions that since the Bank created the contradictory CLA and LOU, it "should have known" that AMG would be deceived as to the true nature of the agreement because the

---

[12] The Bank also argues that the unconditional nature of the Subordination Agreement and the operation of the conclusive presumption of Evidence Code section 622 bar AMG from asserting that the LOU was not part of the loan to which it subordinated. We address and reject those arguments in the next section of our discussion.

24

LOU was not disclosed.  As the Bank acknowledges, this conclusion is based on the trial court's findings that the LOU materially modified the CLA, that AMG was unaware of the LOU, and that it would never have agreed to subrogate its lien had it known of the LOU terms.  In support of its argument, the Bank relies on general cases reflecting the reluctance of courts to impose a duty on a defendant to speak.  The Bank also argues that the court's conclusions cannot be justified on a negligence rationale either.

These arguments do not require reversal of the judgment.  As we have discussed, the trial court's judgment was based on the *Gluskin* theory.  That theory is based on conduct by the Bank which resulted in unconsented material modifications of the loan transaction which impaired AMG's security, rendering the Subordination Agreement unenforceable.  The judgment is not based on traditional notions of duty discussed by the Bank.

*2. The Bank's Arguments Based on Language of the Subordination Agreement*

    *a.  Subparagraph (b) Waiver of Duty*

The Bank argues against imposition of a duty under the *Gluskin* theory by contending there can be no implied obligation on the Bank to ensure proper use of proceeds because AMG expressly waived such an obligation under the language of paragraph (b) of the Subordination Agreement.  Paragraph (b) states in relevant part: "Lender in making disbursements pursuant to any such agreement is under no obligation or duty to, nor has Lender represented that it will see to the application of such proceeds by the person or persons to whom Lender disburses such proceeds and any application or use of such proceeds for purposes other than those provided for in such agreement or agreements shall not defeat the subordination herein made in whole or in part . . . ."

This argument ignores the reasoning in *Gluskin*, which involved such a waiver by the subordinating seller.  As we have discussed, the *Gluskin* court found a separate basis for imposition of the duty on the lender in public policy despite the waiver language in the subordination agreement in that case.  Since the Subordination Agreement here is not enforceable for the reasons we have stated, its express terms are no longer enforceable and provide no shelter to the Bank.  This disposes of the Bank's waiver argument.  It also

disposes of the Bank's extensive argument that AMG's agreement to subordinate is "unconditional" because the terms of the Subordination Agreement are unenforceable.

      *b. Subparagraph (a) Consent and Approval*

      The Bank also relies on paragraph (a) of the Subordination Agreement which reads: "[AMG] consents to and approves (i) all provisions of the note and deed of trust in favor of Lender above referred to, and (ii) *all agreements*, *including but not limited to any loan or escrow agreements*, *between* [*Riverton*] *and Lender for the disbursement of the proceeds of Lender's loan . . . .*" (Italics added.) The Bank argues that this statement is subject to the conclusive presumption of Evidence Code section 622, citing *Banco Do Brasil v. Latian, Inc.* (1991) 234 Cal.App.3d 973, overruled on other grounds by *Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1182 [holding that parol evidence may be used to prove promissory fraud].

      Evidence Code section 622 provides that "'facts recited in a written instrument are conclusively presumed to be true as between the parties thereto . . . .' This section is based upon the doctrine of estoppel by contract; i.e., a party to a contract is generally estopped to deny essential facts recited therein. [Citations.]" (*In re Marriage of Brooks & Robinson* (2008) 169 Cal.App.4th 176, 184.) The *Brooks* court concluded that the presumption "applies 'as between the parties' to written instruments" but not to persons who are not parties to the instrument. (*Ibid.*) In that case, the party against whom the presumption was invoked was not a party to any of the written instruments involved in the case. On that ground, the court found Evidence Code section 622 had no application. (*Ibid.*)

      Evidence Code section 622 does not bar an assertion of fraud or other grounds for rescission of a contract or to recitals in an adhesion contract. (*Bruni v. Didion* (2008) 160 Cal.App.4th 1272, 1291 [holding plaintiffs are not bound by Evid. Code § 622 to a recital that they had read a sample copy of a warranty booklet.].) We conclude that Evidence Code section 622 has no application here.

26

*c. Subparagraph (c) Knowledge of Bank's Reliance*

The Bank argues that AMC acknowledged, in the Subordination Agreement, paragraph (c), that the Bank was willing to make the loan only if AMG unconditionally subordinated its deed of trust to the Bank's deed of trust, and that the Bank intended to act in reliance upon AMG's agreement to subordinate. In support of this argument, the Bank relies upon *Swiss Property*, *supra*, 60 Cal.App.4th 839. In that case, the Court of Appeal held that a lender could rely on an unconditional California Land Title Association (CLTA) form subordination agreement. Like the Subordination Agreement here, the agreement in *Swiss Property* expressly stated that the lender was not obligated to see to the application of loan proceeds and that the use of loan proceeds for purposes other than those provided for would not defeat the subordination agreement. It also contained a warning, identical to the one in our Subordination Agreement, stating: "Notice: This subordination agreement contains a provision which allows the person obligated on your real property security to obtain a loan a portion [of] which may be expended for other purposes than improvement of the land." (*Id*. at p. 845.) We have concluded that *Swiss Property* is distinguishable because the court found in that case that the modification to the loan transaction was not material and did not impair the security of the subordinated seller.

Substantial evidence supports the trial court's conclusions that *Gluskin* controls the disposition of this case. It found, and we agree, that since the Bank drafted both the CLA and the LOU, it knew that the documents "were so contradictory in material parts, that one had to modify the other . . . ." Although the custom and practice in the banking industry is to reference or attach modifications to a loan agreement, the Bank did neither. In addition, the Bank required the Subordination Agreement as a condition of its construction loan. Unlike AMG, it therefore had knowledge of all circumstances of this transaction. AMG subordinated its security interest without knowing that the transaction had changed materially, and to its detriment. We agree with the trial court that the Bank "had a duty to AMG not to enter into a course of conduct with Riverton and the others the effect of which could destroy [AMG's] interest." Under the *Gluskin* line of cases, the

27

Bank's conduct in this case rendered the Subordination Agreement unenforceable, and gave AMG's lien priority.

D. *Third Party Reliance*

The Bank argues it was a third party beneficiary of the Subordination Agreement, and that its reliance on the agreement precludes AMG from seeking to abrogate it. It relies upon *Principal Mutual Life Ins. Co. v. Vars, Pave, McCord & Freedman* (1998) 65 Cal.App.4th 1469 (*Principal Mutual*) and *Gill v. Rich* (2005) 128 Cal.App.4th 1254 (*Gill*). Neither case arises in the context presented here. In *Principal Mutual*, the issue was whether foreclosure on an office building by a lender who had subordinated its loan to preexisting leases extinguished a tenant's lease.[13] The court repeated the principle that unless an agreement is rescinded, a third party beneficiary may still enforce it. (*Principal Mutual,* at p. 1486.) No issue regarding the rights of a subordinated seller was raised or discussed in that case. In addition, the court noted that there was no evidence that the trust deed at issue was made in reliance on the attornment provision of the lease. (*Id.* at p. 1487, fn. 9.[14])

Similarly, in *Gill*, *supra*, 128 Cal.App.4th 1254, hundreds of physicians and surgeons formed an interindemnity arrangement, including a trust, to provide an alternative to malpractice insurance under provisions of the Insurance Code. Eventually the trust was unable to meet its obligations and was forced into receivership. Forty-seven members refused to pay assessments levied upon them by a receiver, who sued and obtained judgments against them. The Court of Appeal held that the appellants could not

---

[13] The case also concerned whether the doctrine of attornment applied, meaning that the tenant had agreed to recognize the landlord's successor in interest as the new landlord. (*Principal Mutual*, *supra*, 65 Cal.App.4th at pp. 1479, 1484.)

[14] The court noted that had there been evidence of reliance, rescission could not have occurred. (*Principal Mutual*, *supra*, 65 Cal.App.4th at p. 1487, fn. 9.) The Bank cites *Spinks v. Equity Residential Briarwood Apartments* (2009) 171 Cal.App.4th 1004, 1025 for the same proposition. That case is distinguishable because it arose in the context of an action by an apartment resident against a landlord who leased the resident's apartment to her former employer.

rescind their contracts with the trust on the ground of fraud in the inducement and related grounds. It recognized that even if a party to a contract has a right to rescind the contract based on fraud (Civ. Code, § 1689, subd. (b)(1)), rescission is not available if it would prejudice another party who has relied upon the contract. (*Gill,* at p. 1265.) Once again, this case did not arise in the context of a subordinating seller whose security interest has been impaired by conduct of the buyer and lender.

The applicable analysis is provided in *Protective Equity Trust #83, Ltd. v. Bybee* (1991) 2 Cal.App.4th 139 (*Protective*), a case relied upon by the trial court in its statement of decision. In that case, summary judgment in favor of a real estate lender based on the seller's subordination agreement was reversed because the buyer had breached the agreement with the seller, rendering the subordination agreement unenforceable. The seller had carried back a note and deed of trust from buyer, which was subordinated to the lenders' loan which was not used for construction. When the buyer defaulted, the seller obtained title at a trustee's sale. The seller then sued the lenders seeking a judgment quieting title and declaring the lender's deed of trust was subordinate to that of the seller. Lenders argued that they had the right to enforce the subordination agreement giving them priority. The Court of Appeal held: "As third party beneficiary of the agreement between seller and buyer, lenders cannot now seek to enforce seller's obligation under that agreement *once that agreement has been breached by buyer. Lenders cannot assert greater rights than those of buyer under the subordination agreement* [citation], and under the agreement buyer would not have been able to force seller to subordinate to a loan other than a construction loan. [Citation.]" (*Id*. at p. 151, italics added.)

The *Protective* court found support for this conclusion in public policy as well: "As between the seller and the construction lender, the lender is in a far better position to monitor and control the buyer's use of funds than is the seller of the property. As stated by Justice Gabbert in *Middlebrook-Anderson Co. v. Southwest Sav. & Loan Assn.*, *supra*, 18 Cal.App.3d at page 1037, '[A]llocation of the loss to the lender would encourage the parties to provide for the various contingencies by contract.'" (*Protective, supra,*

29

2 Cal.App.4th 139, 151.)  The Court of Appeal held that the buyer breached the subordination agreement with the seller and that it was therefore unenforceable by the lenders.  (*Ibid.*)  Since priority was based on the subordination agreement only, upon failure of the agreement, priority was ordered reversed and the seller's trust deed was deemed senior to the lenders' trust deed.  (*Ibid.*)

*D.  Conclusion*

In light of our conclusion that AMG was entitled to judgment under the *Gluskin* theory, we need not and do not discuss the Bank's disbursement of loan funds in violation of the terms of the LOU and CLA, an alternative ground for the judgment discussed by the trial court in its statement of decision.  We also do not discuss a related alternative ground not reached by the trial court, that the Bank improperly made optional advances of loan funds to Riverton.


III

The Bank argues the trial court's "punitive" refusal to grant it an equitable lien was "wholly unwarranted."  It asserts:  "[T]he character of the Bank's conduct was not inherently wrongful but only resulted from failure to prevent a fraud by AMG's associates about which it had no knowledge or suspicion."  The Bank argues that denial of its claim for an equitable lien bestowed a windfall on AMG.

The Bank's role in this transaction is not so benign.  Equitable subrogation is not available where the party invoking it is "chargeable with culpable and inexcusable neglect" or the superior equities of the otherwise senior lien holder would be prejudiced by granting equitable subrogation.  (*JP Morgan Chase Bank, N.A. v. Banc of America Practice Solutions, Inc.* (2012) 209 Cal.App.4th 855, 861.)  The record establishes that the balance of the equities in this case was with AMG, not the Bank.

## DISPOSITION

The judgment is affirmed.  AMG is to have its costs on appeal.

CERTIFIED FOR PUBLICATION

EPSTEIN, P. J.

We concur:

WILLHITE, J.

MANELLA, J.

31