Filed 4/15/22  Missinato v. Missinato CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| MARCO MISSINATO, | B305989 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. BC722155) |
| ELISABETTA MISSINATO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard L. Fruin, Jr., Judge.  Reversed.

Matthew D. Kanin; AlvaradoSmith and W. Michael Hensley for Defendant and Appellant.

Oldman, Cooley, Sallus, Birnberg, Coleman & Gold and Melody Heinemann Dosch for Plaintiff and Respondent.

# INTRODUCTION

Marco Missinato sued his sister, Elisabetta Missinato, claiming a 50 percent ownership interest in residential property Elisabetta purchased with funds provided by their mother, Anna Rossi. Marco alleged that, although title to the house was in Elisabetta's name, Rossi intended, and her children orally agreed, the property would be owned equally by Marco and Elisabetta. Following a court trial, the trial court issued an interlocutory judgment of partition declaring Marco and Elisabetta tenants in common and ordering them to sell the property.

Elisabetta appeals from the interlocutory judgment, arguing Marco's claims were barred by the statute of limitations. We conclude Marco's cause of action for partition was barred by the statute of limitations. We also conclude that, although the trial court did not (as the parties seem to believe) impose a resulting trust, Marco's claim for such a remedy was, in any event, barred by the statute of limitations as well. Therefore, we reverse.

# FACTUAL AND PROCEDURAL BACKGROUND

A.     *Rossi Provides Funds To Purchase the Property*

In December 2011 Rossi, an Italian citizen who lived in Rome, came to Los Angeles to visit her two adult children, Marco and Elisabetta. Rossi told her children she wanted to give each of them approximately $450,000 as an advance on their inheritance. Elisabetta said she wanted to use her share to buy a house. On January 13, 2012 Rossi transferred approximately $950,000 to

Marco's bank account, and the next day Marco gave Elisabetta a cashier's check for $900,000.[1]

Elisabetta and Rossi began looking at houses with the help of Andrea Valentine, a real estate agent and friend of Elisabetta. According to Marco and Rossi, whose testimony the trial court credited, the family initially looked at homes in the $400,000 price range, but Elisabetta could not find one she liked for that price. Elisabetta found a house she wanted to purchase on Oxford Avenue in Los Angeles, but the price was almost $900,000. Marco, Elisabetta, and Rossi all liked the property and believed it would be a good investment. Marco told Rossi and Elisabetta he would combine his gift with Elisabetta's so that she could have $900,000 to buy the Oxford Avenue property, if Elisabetta agreed the two of them would own the property equally.[2]

On January 16, 2012 Elisabetta signed a contract to purchase the Oxford Avenue property for $865,000. A grant deed transferring title to Elisabetta was recorded on February 2, 2012. The family put Elisabetta's name only on the grant deed because Rossi believed (incorrectly) that Elisabetta, unlike Marco, was a

---

[1] The money Rossi transferred came from the proceeds of the sale of two apartments in Rome, one of which had been held in Marco's name.

[2] Elisabetta's version, which the trial court did not credit, was that Rossi gave her $900,000 and that she never looked at any property priced under $700,000. Elisabetta denied having conversations with Rossi or Marco about combining her gift with Marco's gift to purchase the property and stated Rossi never said before escrow closed she expected Elisabetta to share the house with her brother.

United States citizen and that the family would get a tax benefit by leaving Marco's name off the title.[3]

## B.     *A Dispute Arises Over Ownership of the Property*

After the close of escrow, Elisabetta moved to the property, where she lived until 2016.  She converted the garage into a small apartment and added a kitchenette to one of the bedrooms.  In May or June 2012 Elisabetta's boyfriend moved in and stayed for four months.  Marco moved to the property in June 2012, but after two months Elisabetta told him she "needed her own space" and asked him to leave, which he did.  Rossi lived in the house intermittently between 2012 and 2016, and Elisabetta sometimes rented rooms to tenants.  Elisabetta paid for renovations to and maintenance of the property, paid property taxes, and kept all rental income.

Soon after the family acquired the property, Rossi and Marco began asking Elisabetta to recognize Marco's interest in the property, but she repeatedly ignored or refused their requests.  For example, in late 2013, after Marco became concerned about his ability to continue working when he was diagnosed with glaucoma, he asked Elisabetta to sell the property so he could have his half of the proceeds, but Elisabetta refused.

---

[3]     The family's attempt to defraud the federal and state taxing authorities was based on a false premise.  Although Rossi testified she thought Elisabetta was a United States citizen when she purchased the house in 2012, Elisabetta did not become a citizen until 2013.  Rossi knew Marco was not a permanent legal resident of the United States, and she believed that, if his name were included on the grant deed, he would owe an additional tax when he sold his interest.

4

When Elisabetta moved to Texas in 2016, Rossi again told Elisabetta it was time to sell the property and divide the proceeds with Marco, but Elisabetta did not do so. In June 2018 Marco wrote Elisabetta, who was living in Texas, and asked her to sell the property and share the proceeds with him. Elisabetta responded in July 2018, refusing to sell the property and stating the property was hers.[4]

C. *Marco Sues Elisabetta*

On September 19, 2018 Marco filed this action against Elisabetta, claiming he was a 50 percent owner of the property. He alleged in his operative second amended complaint causes of action for declaratory relief, resulting trust, accounting, breach of fiduciary duty, conversion, quasi contract seeking restitution, breach of oral partnership, and partition by sale.

Following a three-day court trial, the court found in favor of Marco, ruling he "established his claim to a one-half interest in the property under a resulting trust by clear and convincing evidence." The court found that, before Rossi funded the purchase of the property, Elisabetta agreed Marco would have an

---

[4] Elisabetta's response is not in the record, and only portions of Marco's letter are. Marco wrote: "'The reason I'm writing to you is to bring up the subject once again of our family home in Los Angeles and reset our family communion of unconditional love and support'" and "'I know this is an emotional subject for us as every time I have brought it up over the years, you have no desire to discuss it.'" He also wrote: "'The only reason mother had the property put in your name . . . was because you are a United States citizen, which saved on having to pay taxes on the purchase price.'"

equal interest in the property. The court credited Rossi's testimony (and Marco's "consistent testimony") that Elisabetta had no objection to the arrangement. The court rejected Elisabetta's statute of limitations defense, ruling the statute of limitations for a claim for a resulting trust does not accrue until the beneficiary has actual knowledge of the repudiation or breach of trust, which the court found did not occur until Elisabetta's July 2018 email to Marco. The court observed that, although there "were undoubtedly discussions with Elisabetta about the fairness of her refusal to acknowledge her brother's interest in the house purchased with their mother's gifts to both children," there was "no credible evidence that Elisabetta repudiated their claims until the summer of 2018." The court concluded Marco's action, filed in September 2018, was timely.

The court issued an "interlocutory judgment for partition by sale of real property" declaring that Marco and Elisabetta owned the property as tenants in common and that "sale of the property and division of the proceeds would be more equitable and practical than a physical division of the property." The court ordered the property to be listed for sale, required the parties to agree on a real estate broker to list the property (with the court to appoint a broker if they could not agree), required the listing price to be least $1.5 million, and directed each party to "execute a grant deed and provide information as requested to obtain title insurance and convey the property to the buyer(s)." Elisabetta timely appealed from the interlocutory judgment.

# DISCUSSION

A.    *The Trial Court Issued an Interlocutory Judgment of
      Partition, Not an Order Imposing a Resulting Trust*

The parties spend most of their time and effort discussing
which statute of limitations applies to a claim for a resulting
trust and when such a claim accrues. Elisabetta argues the
applicable statute of limitations is four years under Code of Civil
Procedure section 343,[5] which she contends began to run when
she repudiated Marco's interest in 2012. She argues in the
alternative the applicable statute of limitations is five years
under section 318, which she contends began to run when Marco
lost possession of the property in 2012. Under either provision,
Elisabetta argues, Marco's action, filed in September 2018, is
barred. For his part, Marco argues that the applicable statute of
limitations is four years under section 343, but that it did not
begin to run until July 2018, when Elisabetta sent Marco an
email stating she would not sell the property.

Both sides' arguments are off target. Although the trial
court stated in its statement of decision it would impose a
resulting trust, the court did not impose a resulting trust (or at
least the court hasn't imposed one yet). Instead, the court
entered what both sides agree makes the judgment appealable
(see § 904.1, subd. (a)(9); *Starcevic v. Pentech Financial Services,
Inc.* (2021) 66 Cal.App.5th 365, 375): an interlocutory judgment of
partition. The interlocutory judgment declared Marco and
Elisabetta jointly owned the property as tenants in common and

---

[5]    Statutory references are to the Code of Civil Procedure.

7

ordered the property to be sold. The court did not impose a resulting trust.

**B.** *Marco's Cause of Action for Partition Is Barred by the Statute of Limitations*

So, what statute of limitations applies to Marco's cause of action for partition? The "general rule [is] that the action for partition between tenants in common is not barred by the lapse of time." (*Akley v. Bassett* (1922) 189 Cal. 625, 645; see *Adams v. Hopkins* (1904) 144 Cal. 19, 27 ["The statute of limitations never bars relief between tenants in common in an action of partition."]; *Patrick v. Alacer Corp.* (2011) 201 Cal.App.4th 1326, 1338 [same]; *Sangiolo v. Sangiolo* (1978) 87 Cal.App.3d 511, 513 [there is no statute of limitations for a cause of action for partition by an owner of property].)

But in an action for partition where the defendant disputes the plaintiff has an ownership interest in the property, thus requiring the plaintiff to prove he or she has such an interest, the applicable statute of limitations is the one that applies to the cause of action on which the plaintiff claims an ownership interest. (See *Akley v. Bassett, supra,* 189 Cal. at p. 645 ["the statute of limitations may be resorted to in an action of partition, so far as it establishes an interest in the property"].) In such a situation, courts determine the gravamen of the plaintiff's claim to an interest in the property. (See *Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 22 ["To determine the statute of limitations which applies to a cause of action it is necessary to identify the nature of the cause of action, i.e., the 'gravamen' of the cause of action."]; *Robin v. Crowell* (2020) 55 Cal.App.5th 727, 739 ["'The

8

gravamen of an action depends on the nature of the right sued upon or the principal purpose of the action.'"].)

And what is the basis or gravamen of Marco's claim to an interest in the property? Marco's claim is that Elisabetta breached an oral agreement she and Marco would both own the property, even though they put title in her name. Specifically, Marco alleges that he and Elisabetta "entered into an oral agreement to purchase property with money they had received from their Mother"; that the two siblings "decided to purchase the property together as partners and made an oral agreement to do so"; that Elisabetta "took title to the Property in her name only with the agreement that [Marco] would share equally in any Proceeds generated by the Property"; that Marco and Elisabetta "always intended and understood that [Elisabetta] held the Property for the benefit of both parties"; and that, as a "proximate result of [Elisabetta's] breach of the oral partnership, [Marco] has been harmed." That's a cause of action for breach of oral contract or, as Marco alternatively describes it, breach of an oral partnership agreement. And what is the statute of limitations for breach of an oral agreement or oral partnership like the one Marco alleges he had with his sister? Two years. (§ 339; *Lucioni v. Bank of America, N.A.* (2016) 3 Cal.App.5th 150, 164.)

Elisabetta, however, has given her brother a gift in this litigation: She does not argue the applicable statute of limitations is two years. Although she raised the two-year statute of limitations in her answer and her trial brief, on appeal Elisabetta argues (incorrectly) the statute of limitations is four years under section 343, giving her brother an extra two years. Thus, under Elisabetta's theory, the issue is whether Marco's

9

cause of action accrued before September 19, 2014, four years before Marco filed this action on September 19, 2018.

Elisabetta argues the statute of limitations began to run in 2012, when she "ousted" him from the property and refused to acknowledge his ownership interest. Marco argues, and the trial court ruled, the statute of limitations did not begin to run until July 2018, when Elisabetta sent Marco an email repudiating his claim and refusing to sell the property. Although both sides cite the wrong statute of limitations, we decide the issues the parties ask us to decide. (See *United States v. Sineneng-Smith* (2020) ___ U.S. ___, ___ [140 S.Ct. 1575, 1579, 206 L.Ed.2d 866] [courts "normally decide only questions presented by the parties"].)

When a cause of action accrues is generally a question of fact we review for substantial evidence or, where the underlying facts are not in dispute or susceptible of more than one legitimate inference, a question of law we review independently. (*Madani v. Rabinowitz* (2020) 45 Cal.App.5th 602, 607.) But because the statute of limitations is an affirmative defense, on which the defendant has the burden of proof (*Pollock v. Tri-Modal Distribution Services, Inc.* (2021) 11 Cal.5th 918, 945), the standard of review is different (*Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838). Where the appellant has failed to meet his or her burden of proof at trial, "'the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law'" because "'the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding."'" (*Ibid.*; see *Lent v. California Coastal Com.* (2021) 62 Cal.App.5th 812, 837-838 [applying this standard to the

10

defense of laches]; *Eisen v. Tavangarian* (2019) 36 Cal.App.5th 626, 647 [applying this standard to the defenses of waiver and estoppel].)  The appellant in this situation has an "'almost impossible'" burden.  (*Atkins v. City of Los Angeles* (2017) 8 Cal.App.5th 696, 734.)

And yet Elisabetta has met it here:  The uncontradicted and unimpeached evidence compels a finding that, no later than 2013, Elisabetta repudiated Marco's alleged oral agreement that he had an ownership interest in the property and that he was entitled to half the proceeds upon a sale.  Marco testified several times that in "late 2013," when he was diagnosed with glaucoma and became concerned about his ability to continue working, he asked Elisabetta to sell the property and share the proceeds, but that she refused.  When Marco was asked, "And at all times since [late 2013], your sister said, 'No, it's not half your house, Marco, it's all mine,' correct?" Marco responded, "Yes."  Marco testified that, when he asked Elisabetta to sell the house in 2013, Elisabetta told him "it was her house and she [did not] want to sell it, more or less."  Elisabetta similarly testified that in or about 2013 Marco demanded she sell the property and share the proceeds with him and that she refused.[6]  Marco's repeated and

---

[6]    The dissent points to testimony that Elisabetta suggested to Rossi that Marco take $450,000 from Elisabetta's inheritance when Rossi died.  (Dis. opn., post at p. 8.)  This testimony, rather than amounting to "an acknowledgement that Marco had an interest in the house" (*id.* at p. 9), confirms the opposite: Elisabetta was telling Rossi that the house was not half Marco's and that, if Rossi wanted to even things out, she could give Marco $450,000.  If Elisabetta were acknowledging Marco had a

11

consistent testimony Elisabetta told him in 2013 that he did not have an interest in the house and that she would not sell it and share the proceeds with him was uncontradicted and unimpeached.[7] Therefore, Marco's cause of action for partition accrued in 2013, and even under Elisabetta's generous four-year statute of limitations, Marco's claim was barred. (See *Ram's Gate Winery, LLC v. Roche* (2015) 235 Cal.App.4th 1071, 1075 [cause of action for breach of contract accrues at the time of the breach]; *Gaglione v. Coolidge* (1955) 134 Cal.App.2d 518, 526 [statute of limitations for breach of oral contract cause of action begins to run upon "an absolute repudiation of the contract"].)[8]

---

50 percent interest in the house, there would be no reason for her to suggest Rossi should increase Marco's inheritance by $450,000.

[7] At one point Marco testified these conversations occurred in "late 2012," but the context of the questioning suggests he meant late 2013. At another point Marco stated these conversations occurred in "2013 or 2014," but he later clarified they were in 2013. In any event, Marco does not argue the statute of limitations does not bar his cause of action for partition because these conversations occurred between September 19, 2014 and December 31, 2014. And because the statute of limitations is actually two years, a few months either way in 2013 or 2014 doesn't really matter.

[8] The dissent asserts that "nowhere in the statement of decision did the trial court find that the . . . discussions between Elisabetta and Marco," where Elisabetta told her brother the house was hers and not his, "occurred in 2013" and that the "statement of decision is silent as to this point." (Dis. opn., post at p. 3.) The issue, however, is not whether the trial court made such a finding, but whether the evidence compels a finding

C. *Marco's Claim for a Resulting Trust Was Barred by the Statute of Limitations*

As discussed, although they disagree about when Marco's claim for a resulting trust accrued, both Elisabetta and Marco argue the applicable statute of limitations is section 343, which provides that "[a]n action for relief not hereinbefore provided for must be commenced within four years after the cause of action shall have accrued." Even if the court had imposed a resulting trust (which it didn't), and even if a resulting trust were a cause of action (which it isn't; it's a remedy),[9] Marco's claim would be barred under a four-year statute of limitations.

A "'"resulting trust arises from a transfer of property under circumstances showing that the transferee was not intended to take the beneficial interest . . . . It has been termed an 'intention-enforcing' trust, to distinguish it from the other type of implied trust, the *constructive* or 'fraud-rectifying' trust.'" . . . [¶] Ordinarily a resulting trust arises in favor of the payor of the purchase price of the property where the purchase price, or a part thereof, is paid by one person and the title is taken in the name of

_____

Elisabetta told Marco this in 2013. And it does. As the dissent acknowledges, "the parties stipulate[d] that Elisabetta testified: 'In or about 2013, [Marco] demanded that [Elisabetta] sell the Property and give him half the proceeds. [Elisabetta] told [Marco] that she would not, as the Property was hers and hers alone.'" (*Id.* at p. 5.)

[9]     See *Marvin v. Marvin* (1976) 18 Cal.3d 660, 665 (resulting trust is an equitable remedy); *Stansfield v. Starkey* (1990) 220 Cal.App.3d 59, 76 (resulting trust is a remedy, not a cause of action).

13

another." (*Martin v. Kehl* (1983) 145 Cal.App.3d 228, 238; see *Fidelity National Title Ins. Co. v. Schroeder* (2009) 179 Cal.App.4th 834, 847-848; *Calistoga Civic Club v. City of Calistoga* (1983) 143 Cal.App.3d 111, 117.) "The statute of limitations does not run on a beneficiary of a resulting trust until he has actual knowledge of repudiation or breach of trust." (*Martin*, at p. 240; see *Berniker v. Berniker* (1947) 30 Cal.2d 439, 447-448 ["In the absence of a repudiation by the trustee, the statute of limitations does not begin to run against a voluntary resulting trust."]; *Estate of Yool* (2007) 151 Cal.App.4th 867, 875 [same].) Marco's uncontradicted and unimpeached testimony was that Elisabetta repudiated any basis for a resulting trust in 2013. Therefore, Marco's claim for a resulting trust (such as it was) is barred under a four-year statute of limitations.

## DISPOSITION

The interlocutory judgment of partition is reversed. Elisabetta is to recover her costs on appeal.

SEGAL, J.

We concur:

PERLUSS, P. J.          WISE, J.*

---

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14

WISE, J., Dissenting.

I agree with the majority's opinion on nearly every substantive point from the recitation of the facts to the applicable law. It is the majority's factual inferences and its conclusion with which I respectfully disagree. Neither the record nor the law supports the majority's determination that the uncontradicted and unimpeached evidence *compels* this court to find that Marco's claim was barred by the statute of limitations because "no later than 2013, Elisabetta repudiated Marco's alleged oral agreement that he had an ownership interest in the property and that he was entitled to half the proceeds upon a sale." After a three-day bench trial the court made a contrary finding: "There were undoubtedly discussions with Elisabetta about the fairness of her refusal to acknowledge her brother's interest in the house purchased with their mother's gifts to both children, but there is no credible evidence that Elisabetta repudiated their claims until the summer of 2018." The trial court's factual finding is supported by the record and is entitled to deference.

As the majority notes, the statute of limitations is an affirmative defense and Elisabetta has the burden of proof. (*Pollock v. Tri-Modal Distribution Services, Inc*. (2021) 11 Cal.5th 918, 945.) Because the trial court found Elisabetta failed to meet her burden at trial, the question on appeal is whether the evidence presented during the bench trial compels us to find in favor of Elisabetta as a matter of law because the evidence was """uncontradicted and unimpeached""" and """of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding."" (*Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838.)

We must consider the evidence in the light most favorable to Marco and draw all reasonable inferences in support of the trial court's findings.  (*Citizens Business Bank v. Gevorgian* (2013) 218 Cal.App.4th 602, 613.)  "Under the doctrine of implied findings, the reviewing court must infer, following a bench trial, that the trial court impliedly made every factual finding necessary to support its decision."  (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 48.)  Elisabetta has, as the majority states, an "'almost impossible'" burden.  (*Atkins v. City of Los Angeles* (2017) 8 Cal.App.5th 696, 734.)

The majority concludes Elisabetta nevertheless has met her burden here because "Marco testified several times that in 'late 2013,' when he was diagnosed with glaucoma and became concerned about his ability to continue working, he asked Elisabetta to sell the property and share the proceeds, but that she refused.  When Marco was asked, 'And at all times since [late 2013], your sister said, "No, it's not half your house, Marco, it's all mine," correct?,' Marco responded, 'Yes.'  Marco testified that, when he asked Elisabetta to sell the house in 2013, Elisabetta told him 'it was her house and she [did not] want to sell it, more or less.'  Elisabetta similarly testified that in or about 2013 Marco demanded she sell the property and share the proceeds with him and that she refused.  Marco's repeated and consistent testimony Elisabetta told him in 2013 that he did not have an interest in the house and that she would not sell it and share the proceeds with him was uncontradicted and unimpeached."[1]

---

[1]     At one point on redirect Marco's counsel mistakenly references 2012 when asking Marco about his discussions with Elisabetta regarding the sale of the house.  Marco did not correct

2

Notwithstanding the majority's conclusion, nowhere in the statement of decision did the trial court find that the above referenced discussions between Elisabetta and Marco occurred in 2013. The statement of decision is silent as to this point. In addition, the evidence on this issue is more nuanced than the majority's summary reveals.[2] During Marco's cross-examination the following exchange occurred:

Q. "Something happened after the purchase of the property to trigger your request that the property be sold and you get half your money, or half the money from the house; that was your disability? . . .

A. Yes, there was a repercussion in my health. At certain point, I was under severe risk to become blind. I have a severe attack of glaucoma in both my eyes. And, in fact, as per today, I am completely blind, 100 percent, in my right eye. . . .[3]

counsel when responding. In footnote 6 the majority concludes, and I agree, the context of counsel's questioning suggest he meant late 2013.

[2] For instance, the majority states without qualification, that "[i]n 2106, Rossi again told Elisabetta it was time to sell the property and divide the proceeds with Marco, but Elisabetta did not do so." However, according to the parties' Agreed Statement on Appeal Pursuant to Stipulation (Agreed Statement), Rossi testified that she "never asked [Elisabetta] to sell the house." (Agreed Statement, p. 8.)

[3] Marco's first language is Italian but unlike Rossi he testified at trial without an Italian interpreter. Although Marco is a fluent English speaker, at times his testimony was grammatically incorrect or was missing words. Out of respect, the transcript is quoted as reported, without the use of [sic].

Q. And when you began to have problems with your vision, you contacted your sister about selling the house?

A. At the time, I felt that – because the danger of being blind, I felt that it would be helpful at this point for me to get my money, because it will be a great support because I wasn't able to work or to do almost anything for a couple of years.  So, Yes, I made a request of Elisabetta.

Q. And she said, "No."?

A. She said, "No."

Q. And this was in late 2013?

A. It's possible, yes.

Q. In your deposition, you were asked, "Do you know when that was?"  Your response was, "I think it was late 2013." Does that sound familiar?

A. Yeah.  I cannot be 100 percent sure, but this sounds familiar, yes.

Q. And at all times since then, your sister said, "No, it's not half your house, Marco, it's all mine," correct?

A.  Yes."

It is clear from Marco's testimony that the event that triggered his communication to Elisabetta was his glaucoma diagnosis.  It is of import that much of the testimony occurred during the first day of trial (November 25, 2019) when, as the trial court noted in its statement of decision, "The parties did not hire a reporter . . . and counsel did not provide summaries . . . ." Marco must have provided additional testimony on this point during the first day of trial because the Agreed Statement, which the parties prepared for this appeal and summarizes the witnesses' testimony from the first day, attributes the following to Marco:  "In 2013 or 2014, Plaintiff was diagnosed with

4

glaucoma.  Concerned for his ability to continue working and earn a living, Plaintiff asked Defendant to sell the Property so he could have one-half of the equity.  Plaintiff sent this request to Defendant by e-mail.  (No e-mail from 2013 or 2014 was admitted into evidence.)"  (Agreed Statement at pp. 5-6.)  Similarly, Elisabetta must have testified about this issue on the first day of trial because in the Agreed Statement the parties stipulate Elisabetta's testified:  "In or about 2013, Plaintiff demanded that Defendant sell the Property and give him half the proceeds.  Defendant told Plaintiff that she would not, as the Property was hers and hers alone."  (Agreed Statement at p. 11.)

In its statement of decision the trial court placed little weight on these discussions, which were only indirectly mentioned in a single sentence when the court noted, "[t]here were undoubtedly discussions with Elisabetta about the fairness of her refusal to acknowledge her brother's interest in the house purchased with their mother's gifts to both children . . . ."  As noted above, nowhere in its statement of decision did the trial court make a factual finding about which month and year Elisabetta and Marco's above referenced discussions occurred.

In *Fladeboe*, the appellate court queried, "In a bench trial, how does an appellant obtain a record affirmatively proving the trial court erred by failing to make factual findings on an issue?" (*Fladeboe v. American Isuzu Motors Inc.*, *supra*, 150 Cal.App.4th at p. 58.)  The court then answered its question as follows: "When the court announces its tentative decision, a party may, under [Code of Civil Procedure] section 632, request the court to issue a statement of decision explaining the basis of its determination . . . .  'Thereafter, under [Code of Civil Procedure] section 634, the party must state any objection to the statement

5

[of decision] in order to avoid an implied finding on appeal in favor of the prevailing party." (*Id.* at p. 59, quoting, *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 (*Arceneaux*).) "Securing a statement of decision is the first step, but is not necessarily enough, to avoid the doctrine of implied findings. Litigants must also bring ambiguities and omissions in the statement of decision's factual findings to the trial court's attention—or suffer the consequences." (*Fladeboe,* at p. 59.) "The *Arceneaux* court explained the 'clear implication' of section 634 is that if a party fails to bring omissions or ambiguities in the statement of decision's factual findings to the trial court's attention, then 'that party waives the right to claim on appeal that the statement was deficient in these regards,' . . . [and] under Code of Civil Procedure section 634, the appellate court will infer the trial court made implied factual findings favorable to the prevailing party on all issues necessary to support the judgment, including the omitted or ambiguously resolved issues." (*Id.* at pp. 59-60, citing *Arceneaux, supra*, 51 Cal.3d at pp. 1133-1134; *SFPP v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 462; *Tusher v. Gabrielsen* (1998) 68 Cal.App.4th 131, 140.)

Elisabetta failed to bring the omission or ambiguity in the statement of decision (regarding the date of Elisabetta and Marco's initial discussion about the sale of the house) to the trial court's attention. Elisabetta therefore waived the right to challenge this fact on appeal and this court should infer the trial court made the implied factual finding that was favorable to Marco—namely (consistent with Agreed Statement that Marco was diagnosed with glaucoma in 2013 or 2014 and he later communicated with Elisabetta regarding the sale of the house)

6

the discussions took place after September 19, 2014, less than four years prior to the date Marco filed his action against Elisabetta. The majority does not address the substance of this argument stating, "Marco does not argue the statute of limitations does not bar his cause of action for partition because these conversations occurred between September 19, 2014 and December 31, 2014." (fn. 6.) But it was not Marco's burden to prove the conversations occurred after September 19, 2014, it was Elisabetta's burden to prove they occurred before that date. It was also Elisabetta's burden to provide "an adequate record affirmatively proving error." (*Arceneaux*, *supra*, 51 Cal.3d at p. 1133.) Because Elisabetta did not retain a court reporter and did not provide the trial court with a summary for the first day of trial, we do not know precisely how Marco described the details surrounding his glaucoma diagnosis in 2013 or 2014. The trial court had the benefit of hearing that testimony and consistent with doctrine of implied findings, we must conclude the trial court's factual determination in favor of Marco was correct.

Even if we had a record of all the testimony regarding Elisabetta and Marco's first discussions about the sale of the house (which we do not), and even if all the evidence confirmed that the discussions unequivocally took place no later than 2013 (which, based on the Agreed Statement, we know is uncertain), there is still the issue of when Marco had actual knowledge that Elisabetta repudiated their agreement. (*Martin v. Kehl* (1983) 145 Cal.App.3d 228, 238.) There was no testimony, and nothing in the Agreed Statement, that established Elisabetta and Marco ever agreed as to when the house would be sold. The trial court also did not make a finding about that detail. In order "to pinpoint the time of an alleged breach for purposes of the statute

of limitations, it is necessary to establish what it was the defendant promised to do, or refrain from doing, and *when its conduct diverged* from that promise." (*McCaskey v. California State Automobile Assn.* (2010) 189 Cal.App.4th 947, 958.) Given all parties agreed Elisabetta would live in the house, take responsibility for its maintenance and benefit from the income of any tenants, and there was no agreement as to when, or under what circumstances it would be sold, it is perhaps not surprising that Elisabetta did not want to sell the house.[4]

According to the Agreed Statement, Marco testified that after he had glaucoma and he asked Elisabetta to sell the house, Elisabetta "did not directly respond to Plaintiff, but said to Mother that she [Elisabetta] would allow Plaintiff to take

---

[4] Marco repeatedly referred to the property that he and Elisabetta jointly purchased in 2012, and in which he had a 50 percent ownership interest, as Elisabetta's house. Taken in context it is clear when Marco referred to Elisabetta's "home" or "house" he was describing the place where Elisabetta lived and was not denouncing his financial ownership of the property. He also explained he agreed to contribute the $450,000 gift he received from Rossi to Elisabetta's home as an investment because "The timing for me wasn't right to acquire a house because I was not in the right situation." When asked "Did you have anything to do with the remodeling, the buildout of the rooms or the bathrooms or anything?" he responded, "No, because at that point, Elisabetta was the manager of the house, and it was her place. It was meant to be her place for the time being, so she took care of full responsibility." Marco was also asked, "Did you ever ask your sister if she needed money for the operating expenses of the house?" he said, "No, because again, she was fully responsible [for] the house, and so she was earning money, and also spending money, but she was also living in the house."

8

$450,000 from Defendant's part of her Mother's inheritance when Mother died to make things equitable." (Agreed Statement at p. 6.)[5] While it is possible to interpret Elisabetta's statement as a repudiation of Marco's interest, such an interpretation would be viewing the facts below in the light most favorable to Elisabetta. We, however, are compelled to view this statement in the light most favorable to Marco and draw all reasonable inferences in support of the trial court's findings. (*Citizens Business Bank v. Gevorgian*, *supra*, 218 Cal.App.4th at p. 613.) Through that lens Elisabetta's comment was not an unequivocal repudiation of their oral agreement but was instead an acknowledgement that Marco had a financial interest in the property. She recognized it would be inequitable for Marco not to benefit from his $450,000 contribution and she was proposing an alternative solution to honor the agreement without selling the house. There is little doubt that Marco interpreted her behavior in that manner, as evidenced by his email to her in 2018 when he wrote: "The reason I'm writing to you is to bring up the subject once again of our family home in Los Angeles and reset our family communion of unconditional love and support . . . . I know this is an emotional subject for us as every time I have brought it up over the years, you have no desire to discuss it." It was only when Elisabetta responded to this email in 2018, and rejected Marco's

---

[5] This testimony occurred on the first day of trial when no court reporter was present.

9

interest in the house, that the trial court found Elisabetta unequivocally repudiated her agreement with Marco.[6]

It is for these reasons that I find Elisabetta has not met her "'almost impossible'" burden.  The trial court's decision should be affirmed.


WISE, J.[*]

---

[6]     Rossi and Marco, Elisabetta's mother and brother--who have known Elisabetta for the entirety of her life--both interpreted Elisabetta's words and conduct similarly; neither believed Elisabetta unequivocally refused to share the house with Marco until July 2018 when Elisabetta emailed Marco and said she would not sell the property stating it was hers.  The trial court found Rossi and Marco, but not Elisabetta, credible.  Given the family history, it was reasonable for the court to rely on Rossi's and Marco's interpretation and understanding of Elisabetta's behavior and conclude Elisabetta repudiated the oral agreement in 2018.  The evidence was sufficient to support that finding.

[*]     Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.