Filed 1/29/25  Ferro v. Merritt CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CARL FERRO, | B330902 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No.20STCV36194) |
| WILLIAM MERRITT, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gail Killefer and Richard J. Burdge, Jr., Judges.  Affirmed in part, reversed in part and remanded.

Pamela A. Mozer for Defendant and Appellant.

Friedman, Enriquez & Carlson, Grant A. Carlson for Plaintiff and Respondent.

Plaintiff Carl Ferro (buyer) sued defendant William Merritt (seller) for breach of contract arising out of a purchase agreement (the PSA) for the sale of residential property. Buyer alleged that under the PSA, it was seller's obligation to deliver the property free from tenants five days prior to the close of escrow. However, as of closing, the property was occupied by seller's business associate, John Mizerak. Seller contends that buyer waived his right to enforce this term of the PSA when buyer signed amended escrow instructions waiving all contingencies and closing escrow knowing the tenant remained in the property.

Following a bench trial, the court entered judgment in favor of buyer. The court found that the PSA was ambiguous and that the intent and conduct of the parties established their agreement that it was seller's obligation to remove Mizerak from the property. The court further found that even if buyer had waived this term, he did not do so knowingly. The court awarded buyer the damages arising from the delay in his ability to move into the property and the attorney fees he paid to evict Mizerak.

On appeal, seller argues that the evidence supported the conclusion that the provision regarding removing tenants was a contingency, which buyer knowingly waived. Seller also challenges the damages award, arguing that buyer failed to mitigate his damages and that the delays in eviction caused by the COVID-19 pandemic were not foreseeable at the time the parties entered into the PSA. We agree that the court erred in finding that buyer was entitled to damages arising from pandemic-related delays and reverse that portion of the damages award. We otherwise find no error and affirm the remainder of the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

## I.  The Complaint

Buyer filed a complaint against seller in September 2020, alleging claims for breach of contract and rescission. Buyer alleged that in October 2019, he and seller entered into the PSA, a written purchase agreement regarding a residential property on Wilkinson Avenue (the property). Buyer further alleged that at the time of the purchase Mizerak was staying at the property with seller's permission. Under the PSA, seller agreed that the property would be vacant at least five days prior to the close of escrow.

2

The complaint further alleged that seller made efforts to evict Mizerak from the property, including serving a 60-day notice to vacate the property in December 2019 and then a 30-day notice to quit in January 2020. However, Mizerak refused to vacate the property and continued to live there as of the date of the complaint. Thus, buyer contended that seller breached the purchase agreement by failing to deliver possession. The complaint sought monetary damages and rescission of the PSA.[1]

## II. Trial

The matter proceeded to a court trial in December 2022. The parties stipulated to the admission of exhibits, including all of the documents detailed herein. The following relevant evidence was adduced at trial.

### A. *The PSA*

The PSA, a modified form agreement issued by the California Association of Realtors (C.A.R.), indicates that it was prepared in October 2019. The paragraphs of the PSA addressing real estate agents and brokers were crossed out.

The parties relied on several provisions of the PSA at trial. Crucially, paragraph 9, titled "CLOSING AND POSSESSION," section D provides, "Tenant-occupied property: Property shall be vacant at least 5 . . . Days Prior to Close of Escrow, unless otherwise agreed in writing. Note to Seller, if you are unable to deliver Property vacant in accordance with rent control and other applicable Law, you may be in breach of this Agreement."

Paragraph 11, titled "CONDITION OF PROPERTY," states that "[U]nless otherwise agreed in writing: (i) the Property is sold (a) 'AS-IS' in its PRESENT physical condition as of the date of Acceptance and (b) subject to Buyer's investigation rights." Paragraph 12, section A provides "Buyer's acceptance of the condition of, and any other matter affecting the Property, is a contingency of this Agreement as specified in this paragraph and paragraph 14B." Paragraph 12, section B (paragraph 12B) requires seller to make the property available for buyer's investigation and requires buyer to "complete Buyer investigations and either remove the contingency or cancel this agreement."

---

[1]     By the time of trial, Mizerak had been evicted from the property and buyer sought only monetary damages.

Pursuant to paragraph 14, section A (paragraph 14A), seller must deliver within seven days of acceptance of the PSA "all Reports, disclosures, and information for which Seller is responsible under paragraphs 5, 6, 7, 8B(5), 10A, D, C, and F, 11A and 13A." If seller fails to do so, buyer may cancel the agreement "after first Delivering to Seller a Notice to Seller to Perform." Section B specifies the time for buyer to complete all investigations and review of information, request action from seller, and remove the applicable contingency or cancel the agreement. Section F (paragraph 14F) deals with the removal of contingencies, stating that if "Buyer removes, in writing, any contingency or cancellation rights, unless otherwise specified in writing, Buyer shall conclusively be seemed to have (1) completed all Buyer Investigations, . . . (ii) elected to proceed with the transaction, and (iii) assumed all liability, responsibility and expense for Repairs or corrections pertaining to that contingency or cancellation right, or for the inability to obtain financing."

The PSA also contained the following integration provision: "All understandings between the Parties are incorporated in this Agreement. Its terms are intended by the Parties as a final, complete and exclusive expression of their Agreement with respect to its subject matter, and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement."

The parties signed amended escrow instructions on January 13, 2020, agreeing to a new escrow closing date of January 15, 2020. The amended instructions provided that buyer and seller "acknowledge full satisfaction and/or waiver of all contingencies to the close of escrow, and hereby authorize Escrow Holder to close the escrow."

## B. *Seller's Testimony*

Seller testified that he bought the property in 2010. Mizerak stayed as a "guest" at the property for about four years, starting in 2016. During this time, seller and Mizerak were working to develop a business based on a software application involving food delivery. Seller did not charge Mizerak rent.

When seller decided to sell the property in 2019, Mizerak helped list and show the property to potential buyers, including buyer Ferro. Mizerak

was a realtor in another state but he was not licensed in California. Seller had agreed to pay Mizerak a commission for the work he was doing for the sale. Mizerak also prepared the PSA. Seller testified that he told buyer that he would not pay the commission for buyer to use a realtor in the sale, so if buyer wanted an agent, he would have to pay for it himself.

Seller understood, under paragraph 9 of the PSA, that he needed to remove the tenant at least five days before close of escrow. Seller also knew that Mizerak wanted to use the property as the base for his business. As early as July 2019, seller sent emails and texts to Mizerak, informing him that seller intended to proceed with the sale of the property and was no longer interested in the business venture. In late 2019, seller learned from buyer that Mizerak was trying to find someone who would buy the house and then lease it back to Mizerak for his business. Seller texted Mizerak in November 2019, informing him that he was planning to sell to buyer by the end of the month. Seller testified that, at this point, Mizerak agreed to move out if the house sold, and seller believed him.

After the parties moved the expected closing date to the end of December 2019 for financing reasons, seller testified that the plan was for buyer to move in at the end of the month and for Mizerak to move out. However, Mizerak continued to email seller about his business plans using the property. Seller testified that he communicated with buyer "on a regular basis" about the situation with Mizerak. Mizerak told seller that it would take him 72 hours to pack up and leave after escrow closed.

According to seller, he learned for the first time that Mizerak did not want him to sell the property in an email on December 8, 2019. Seller then contacted a lawyer to help him prepare a notice of eviction. On December 11, 2019, seller emailed Mizerak a 60-day notice to vacate the property, stating that Mizerak's "verbal month to month tenancy will end in 60 days." Seller told buyer about the notice the following day. Seller also discussed with buyer that it might be a problem to get Mizerak to leave before escrow closed, in light of the timing of the 60-day notice. Seller and buyer discussed options, including a lease-back of the property to seller for $5,000 per month until seller was able to evict Mizerak. Seller testified that as of early January 2020, he was willing to pay up to $15,000 to cover three months of buyer's

expenses through a lease-back if necessary. The parties never entered into a lease-back agreement, however. Seller testified that he and buyer discussed his continued belief that Mizerak would leave once escrow closed. They agreed that it was in both of their best interests to close escrow first and deal with Mizerak second because they did not want Mizerak to sabotage escrow.

Seller continued to have concerns that Mizerak was "sabotaging the deal," so, on January 3, 2020, he emailed the escrow company, asking to have Mizerak removed from communications related to the sale. He copied buyer on the email. Seller continued to talk to buyer on a regular basis about Mizerak's possible reluctance to leave by the closing date. By the beginning of January, the parties had extended the closing date to January 6, 2020 and then, ultimately, to January 15.

A few days before closing on January 15, seller emailed buyer a draft eviction form, saying "I hope you never need to use it." Seller also emailed buyer the name of an "eviction company we might want to talk to about getting [Mizerak] out if it is a problem." Seller stated that he discussed with buyer the plan that after closing, seller would visit the property, tell Mizerak that the house had sold, then turn the keys over to buyer.

Escrow closed and the sale price of $725,000 was recorded on January 15, 2020. Mizerak remained living at the property. Seller testified that up to and after closing, he and buyer continued to communicate about the fact that Mizerak had not vacated. After seller turned over the house keys to buyer, seller reminded Mizerak of his promise to leave the property within 72 hours of closing. Mizerak responded that he had until February 10 or 11 to leave under the 60-day notice. Seller "offered to, you know, do whatever it would take to get him out of the property." When Mizerak said he would take $2,500 to be out in 72 hours, seller paid him $2,500.

Seller texted buyer on January 17, 2020 that Mizerak "is moving out Sunday night. You will have the house free on Monday morning [January 20]. Can I ask you to hold off on your meeting today and tomorrow and let's start fresh on Monday. I know that I'm asking a lot of you and I have asked a lot but I don't want you to deal with this aggravation." Seller testified that he did not think it was his obligation to get Mizerak out, but that he "felt that it was something that [buyer] purchased the home, and it was, you know,

trying to get [Mizerak] out any way I could." Seller stated that he told buyer it was not seller's obligation to evict Mizerak, but he did not know if he confirmed this statement in writing. Seller later testified that he paid Mizerak as quickly as he could after closing, because he understood it was important that Mizerak leave the property.

Around the same time, on January 16, seller hired attorney Rebecca Hufford-Cohen to serve Mizerak with a 30-day eviction notice. He paid the attorney $1,490 but explained that she was retained on buyer's behalf as the new owner. Seller testified that he did not think he was required to take this step, but he did it to "help get [Mizerak] out as quickly as possible."

On January 18, 2020, Mizerak texted seller that he had "changed [his] mind" and would not leave. Instead, Mizerak told seller that buyer would "probably pay around $6,000 cash for me to leave," and that he would leave once buyer put "$6,000 into escrow for you to receive. This money will come directly to you."

Seller testified that after Mizerak backed out of his agreement to vacate for $2,500, seller continued to try to get Mizerak to leave the property. On January 21, seller emailed buyer stating that seller would pay the $6,000 demanded by Mizerak to leave, but that Mizerak "need [*sic*] to think the funds are coming from you . . . and I'm not in the mix. Like you I just want to get him out ASAP." Buyer responded that he was not "putting any money into an escrow account for anyone. I certainly wouldn't give that guy a dime at this point. It sounds like extortion."

On January 22, seller texted Mizerak that he talked to a lawyer acquaintance who said buyer could sue seller because "the contract says no tenant, and since you are still there, [buyer] can sue me." Seller claimed at trial that he did not actually speak to a lawyer, he thought a lawsuit by buyer "potentially could happen" and he was trying to "pull on [Mizerak's] heart strings" and convince him to leave. He also told Mizerak that "you knew . . . that the property needed to be vacant before closing." Seller explained that he was trying to tell Mizerak, "You made commitments to me. I made commitments to [buyer]. And for that reason you need to move out."

On January 24, 2020, seller's counsel, Pam Mozer, sent a letter to buyer stating that buyer had waived the right to require seller to evict

Mizerak.  Seller admitted at trial that prior to this letter, he had never told buyer that he had waived any rights.

C.    **Buyer's Testimony**

Buyer testified that he originally intended to move into the property with his wife and children, but never actually did so because Mizerak threatened to murder him after his eviction.  At the beginning of the sale, Mizerak told buyer that he was acting as the realtor for the property owner and buyer understood that he was supposed to do everything related to the sale through Mizerak.  Buyer also knew that Mizerak was living at the property.  In addition, Mizerak told buyer that he could not have his own realtor or they would not sell to him, so buyer proceeded without a real estate agent.

Buyer testified that he understood paragraph 9D of the PSA to mean that the property would be vacant five days before closing and, if not, then "the seller would be in breach for default."  No one ever stated that this provision was a contingency or asked him to waive any contingencies regarding this provision.  Buyer understood the "as is" provision in paragraph 11 to reflect the physical condition of the property, not possession.  Buyer stated that he and seller discussed the "as is" provision consistent with this understanding.  Early in the sale process, Mizerak told buyer that if he did not participate in Mizerak's business, then Mizerak would not sell him the property. At the time, buyer was not sure who the owner was and had not yet spoken with seller. He found a phone number for seller and called him.

At the time of the final walk-through inspection about a week before closing, Mizerak refused to allow buyer into the house.  Seller told buyer that he should just skip the walk-through and "we can handle that outside of escrow because [Mizerak is] there and do you really need to see it?"  Buyer agreed that he did not need to see the house, as he was planning to remodel so that the physical condition of the property was not important.  Buyer had completed all inspections other than the final walk-through.  Seller also continued to assure buyer, "don't worry.  I'll have [Mizerak] out by closing."  Prior to closing, seller never suggested that Mizerak would be buyer's problem once escrow had closed.

Seller told buyer multiple times, including a few days before closing, that he would have Mizerak out by the closing. Buyer stated that he reminded seller it was seller's responsibility; seller agreed and said that he would do it. On the day of closing, seller brought buyer the keys and told him that Mizerak was still residing at the property. Seller asked buyer to give him a few more days, to trust him, and that Mizerak would be out by the end of the week. Buyer stated that he trusted seller, and had warned him two days before that if he did not get Mizerak out, seller would be in breach of contract and buyer would sue him. Seller never said that he was not responsible or claimed that buyer had waived any rights. As directed by seller, buyer stopped communicating with Mizerak regarding the sale after December 8. Seller continued to assure buyer not to worry about Mizerak, promising he would get him out by the closing date of January 15. Even after seller told buyer that he had served Mizerak with a 60-day notice, seller maintained that he would have him out by closing.

When he signed the amended escrow instructions in January 2020, buyer did not intend to waive the provision that required the seller to remove Mizerak. He signed the amended escrow instructions because he felt the contingencies had been satisfied. He did not think there was a need to include anything carving out the tenant occupancy issue because the PSA and seller both said that the tenant would be out. Buyer understood the applicable contingencies to be those covering the loan, inspections, appraisal, and termites, as specified in the PSA. He testified that everyone understood that it was seller's responsibility to get Mizerak to move out.

Around the time of the 60-day notice, buyer and seller discussed a possible lease-back, with seller paying buyer up to $15,000 to lease back the property and evict Mizerak. Buyer explained that they did not go forward with the lease-back because it would have delayed the close of escrow, which seller did not want to do. Seller told buyer they would not need the lease-back because Mizerak would be out by closing.

Seller retained and paid for the first unlawful detainer attorney, Hufford-Cohen, to serve a formal eviction notice. Seller told buyer that buyer had to be listed as the client. When a member of Hufford-Cohen's staff asked buyer for more money to proceed with the lawsuit, buyer responded that it

9

was seller's responsibility and terminated the retainer.  Buyer understood that seller hired the attorney himself because seller knew the eviction was his responsibility.  Seller also reported to buyer that he paid Mizerak $2,500 to leave.  After Mizerak increased his demand to $6,000, seller offered to provide the funds but told buyer that the payment had to be in buyer's name.  Buyer refused, telling seller that seller should handle it, because Mizerak was "your responsibility from day one."  During these conversations, seller never refuted the idea that it was seller's responsibility to evict Mizerak.

After firing Hufford-Cohen, buyer consulted with a Missouri law firm on January 30, 2020 for advice in responding to the letter he received from seller's counsel claiming waiver.  In March 2020, as a self-represented litigant, buyer filed an unlawful detainer action against Mizerak. Buyer also consulted with several other attorneys, but he could not take further steps during the pandemic, because the courts were closed.  In December 2020, buyer retained a second unlawful detainer attorney, Dennis Block, and was able to evict Mizerak by locking him out of the property on November 1, 2021.  Buyer testified that he incurred damages from having to pay rent and utilities on his prior residence along with the mortgage on the property, as well as attorney fees to evict Mizerak.

### D.    Other witnesses

Attorney Hufford-Cohen testified for the defense that she was retained to start the paperwork for the unlawful detainer against Mizerak, and she prepared and served the 30-day notice on Mizerak.  Hufford-Cohen stated that she was paid by seller, but buyer was her client as the new property owner.  Prior to the expiration of the 30-day notice, her services were terminated before she could proceed to the next step of filing a lawsuit.  Hufford-Cohen estimated that if she had proceeded, they could have brought the case to trial around March 10, which would have been just before the courts shut down due to the COVID-19 pandemic.  She recalled that the courts reopened in September 2020 and that the COVID-19 restrictions on evictions would not have applied to this case, since Mizerak had a tenancy-at-will.

Seller also presented expert testimony by John Pagliassotti, a licensed real estate broker.  He defined a contingency as "something . . . that's offered

to the buyer for them to conduct their due diligence on the property." He also explained that most contingencies relate to the physical condition of the property. Pagliassotti opined that the term in the PSA requiring seller to remove all tenants was a contingency that buyer waived by the amended escrow instructions. In his opinion, because he waived the contingency, buyer accepted the responsibility to remove the tenant. If buyer did not want to waive that contingency, he could have carved it out of the amended escrow instructions, or he could have served the seller with a notice to perform. Buyer also had the option to conduct a final walk-through of the property five days prior to closing, as set forth in the PSA.

During cross-examination, Pagliassotti acknowledged that neither party to this sale was a realtor. He also agreed that there was nothing in paragraph 9 of the PSA that would explicitly alert buyer, as a lay person, that by waiving contingencies he was waiving his right to possession without the tenant.

## III. Decision[2]

---

[2] In seller's opening brief on appeal, his counsel makes numerous highly caustic comments disparaging the trial court's ruling and reasoning. For example, counsel asserts that the court had to "butcher" the law to reach its conclusion, the court "blatantly ignored the actual facts and the applicable laws" to reach an "unsound and improper ruling," and "[i]n no world could one believe" the contract interpretation reached by the court. Counsel's commentary is both unprofessional and unhelpful to deciding the issues on appeal. It violates the California Attorney Guidelines of Civility and Professionalism, promulgated by the State Bar in 2007, which provides that an attorney's "obligation to be professional . . . includes civility, professional integrity, personal dignity, candor, diligence, respect, courtesy, and cooperation, all of which are essential to the fair administration of justice and conflict resolution." (California Attorney Guidelines of Civility and Professionalism (2007) Introduction, p. 3, archived at <https://perma.cc/X6XH-QVYE>; see also Cal. Rules of Court, rule 9.7 [attorney oath to "conduct myself at all times with dignity, courtesy and integrity"]; Los Angeles County Superior Court Rules, App. 3.A ["Counsel should always deal with parties, counsel . . . court personnel and the judge with courtesy and civility."].) "Ad hominem attacks and other invective detract from counsel's legal arguments, signal inappropriate personal

After the parties rested, the court heard and denied seller's motion for judgment on the pleadings. The parties submitted closing arguments by written brief and oral argument at a hearing on January 19, 2023.

The court issued a written tentative statement of decision, to which seller submitted objections. Buyer filed a response. The court requested supplemental briefing regarding contract damages, which the parties submitted.

The court issued its 18-page statement of decision on April 12, 2023, finding in favor of buyer on his breach of contract claim. The court identified the "central issue" in the case as "whether the removal of Mizerak from the Property was a 'contingency' in the [purchase agreement] that Buyer waived when he signed the [amended escrow instructions]." The court found that "[a]ll Seller's actions indicated that he understood that he was responsible for removing Mizerak from the property." The court cited a text from seller to Mizerak on January 21, 2020 (after closing) as evidence that seller "still believed the PSA Required him to remove Mizerak from the Property."

Regarding interpretation of the PSA, the court found that the contract "does not identify the contingencies to the Agreement and the parties argued different interpretations of the PSA at trial," with buyer citing paragraph 9D and seller citing paragraph 12. The court found that neither paragraph 14F nor the amended escrow instructions provided any further guidance. The court concluded that the PSA "is ambiguous with regard to whether ¶ 9D is a 'contingency' of the Agreement and, therefore, turns to extrinsic evidence to determine the mutual intent of the parties."

The court disagreed with seller that "contingency" was a technical term and therefore should be interpreted as understood by an expert in the field. The court explained that neither party was represented by a lawyer or broker in the transaction, Mizerak stated he would not sell the house to buyer if buyer used a broker, and that it was undisputed that Mizerak drafted the

embroilment in the dispute, and indicate an inability to engage in the reasoned analysis the courts need and counsel's clients deserve. . . . Appellant's counsel would be well advised to refrain from incivility in the future." (*WasteXperts, Inc. v. Arakelian Enterprises, Inc.* (2024) 103 Cal.App.5th 652, 667.)

PSA, thus "any uncertainty in the PSA should be interpreted against Seller." Thus, in interpreting the PSA, "the court looks to the 'meeting of the minds' of the parties rather than the interpretation of technical terms by an expert." The court concluded that "[a]t the time of contracting through the date of closing . . . the parties understood and agreed that Seller would remove Mizerak from the Property."

The court further found that even if the requirement that seller remove Mizerak was a waivable contingency, "the evidence does not support a finding that Buyer knowingly waived his right to require Seller to remove Mizerak from the Property." The court noted that the burden was on seller to prove a knowing waiver by clear and convincing evidence. The court found that seller failed to meet this burden, citing "considerable" evidence from buyer that "he never intended to waive his right to demand Mizerak be removed." The court found that at the time of closing, "both parties were acting with the understanding and agreement that the PSA required Seller to remove Mizerak from the Property," as expressly stated in paragraph 9D of the PSA. Conversely, "[t]here was no evidence at the time of closing that either party believed that removing Mizerak was a 'contingency' that Buyer waived." Similarly, the court found that "both parties understood, throughout their dealings up through the date of closing, that the 'As Is' provision of the PSA pertained to the physical condition of the property, and not the occupancy of Mizerak."

With respect to damages, the court observed that buyer sought damages in three categories: 1) $4,700 per month for the rent he paid from January 2020 until Mizerak was evicted on November 1, 2021; 2) $2,560 paid to a Missouri law firm in late January 2020 for advice after receiving the letter from seller's counsel claiming waiver; and 3) $10,612.50 paid to attorney Block for the unlawful detainer proceedings against Mizerak. In the first category, the court concluded it would award the lesser amount of $4,1844.55 per month, which buyer paid for his mortgage during the period where he was paying for both properties. The court found the payment to the Missouri law firm in January 2020 was not reasonable and necessary but found buyer was entitled to the attorney fees paid to Block for the unlawful detainer.

The court then addressed seller's argument that buyer failed to mitigate his damages, including by failing to take steps to notify seller in advance of closing that buyer would treat the issue as a breach (such as serving a notice to perform or conducting a final walk-through), failing to work with buyer after closing (using a leaseback or allowing seller to pay $6,000 to Mizerak in buyer's name), and by delaying the legal proceedings to evict Mizerak. The court rejected most of these arguments, finding that buyer did not take the suggested steps prior to closing because he did not understand the removal of Mizerak to be a contingency under the PSA and was satisfied with the physical condition of the property. The court also found that buyer had no obligation to prepare a lease-back or agree to a $6,000 payment he considered to be extortion. However, the court agreed with seller that buyer could have retained a new attorney in September 2020, as there was evidence that court proceedings had resumed by that time. Thus, the court struck three months of mortgage payments from the award.

The court also addressed seller's argument that he should not be responsible for unforeseeable delays in Mizerak's eviction caused by the pandemic and that if buyer had immediately pursued eviction, he could have evicted Mizerak by May 2020. The court found that difficulty in evicting Mizerak was foreseeable, citing communications as early as July 2019 suggesting that Mizerak was "difficult" and then became "increasingly defiant." The court further found that seller's argument regarding the possible earlier date of eviction was speculation. The court awarded buyer a total of $88,026.67 in damages, as the amount that would "compensate [Buyer] for all the detriment proximately caused" by the breach of the PSA, citing Civil Code section 3300.[3]

The court entered judgment for buyer on April 12, 2023. Seller timely appealed.

---

[3]     The court also issued a detailed ruling on seller's objections, overruling them for many of the same reasons discussed below.

14

# DISCUSSION

## I. Standard of Review

In reviewing a judgment following a bench trial, "we review questions of law de novo. [Citation.] We apply a substantial evidence standard of review to the trial court's findings of fact. [Citation.] Under this deferential standard of review, findings of fact are liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings." (*Lopez v. La Casa De Las Madres* (2023) 89 Cal.App.5th 365, 378, citing *Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981 (*Thompson*).)

A single witness's testimony may constitute substantial evidence to support a finding. (*Lopez, supra*, 89 Cal.App.5th at p. 378, citing *Citizens Business Bank v. Gevorgian* (2013) 218 Cal.App.4th 602, 613.) An appellate court does not reweigh the evidence or assess witness credibility. (*Niko v. Foreman* (2006) 144 Cal.App.4th 344, 364.) "A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness." (*Lopez, supra*, 89 Cal.App.5th at p. 378, quoting *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.)

## II. Analysis

### A. *Interpretation of the PSA*

Seller contends the PSA was unambiguous and thus the court erred in looking outside the agreement to determine whether the provision regarding removal of the tenant was a contingency that buyer waived. We find no error.

"Under long-standing contract law, a 'contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful.' (Civ. Code, § 1636.) Although 'the intention of the parties is to be ascertained from the writing alone, if possible' (*id.*, § 1639), '[a] contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates' (*id.*, § 1647)." (*Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 524.) Courts must also endeavor to give effect to every part of a contract, "if

reasonably practicable, each clause helping to interpret the other[s]."  (Civ. Code, § 1641.)

"Courts may consider extrinsic evidence for two purposes—namely, (1) to answer the threshold question of whether a contract is 'ambiguous' in the first place (that is, whether the contract's terms are reasonably susceptible to more than one interpretation); and (2) if the contract is ambiguous, to resolve that ambiguity."  (*Carolina Beverage Corp. v. FIJI Water Co., LLC* (2024) 102 Cal.App.5th 977, 989.)  Thus, "[t]he test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible."  (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.*(1968) 69 Cal.2d 33, 37; see also *Iqbal v. Ziadeh* (2017) 10 Cal.App.5th 1, 7 (*Iqbal*).)

The threshold issue of whether to admit the extrinsic evidence is a question of law subject to de novo review.  (*Iqbal, supra,* 10 Cal.App.5th at p. 8, citing *Appleton v. Waessil* (1994) 27 Cal.App.4th 551, 554-555.)  "[W]here the interpretation of a contract turns upon the credibility of conflicting extrinsic evidence which was properly admitted at trial, an appellate court will uphold any reasonable construction of the contract by the trial court."  (*Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 913; see also *Iqbal, supra,* 10 Cal.App.5th at p. 8; *Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632.)

Here, the court admitted extrinsic evidence to determine whether the PSA was ambiguous, and then to resolve the ambiguity.  The agreement stated in paragraph 9D that seller was responsible to deliver a vacant premises.  The potential ambiguity was whether this constituted a "contingency" that buyer waived by signing the amended escrow instructions two days before closing.  We find no error in the court's consideration of extrinsic evidence.

We agree with the trial court that the PSA is ambiguous as to whether paragraph 9D was included as a contingency.  Paragraph 9, which contains several provisions regarding delivery of possession of the property if it is vacant, seller-occupied, or tenant-occupied, and delivery of items such as keys

at closing, does not contain any language indicating that any of its terms are contingencies of the agreement. Conversely, several other provisions of the PSA expressly state that a term is or is not a contingency, such as for receipt of an appraisal (¶ 3.I.), qualification for a loan (¶ 3.J.(2)), and the sale of other property (¶ 4). The lack of similar language in section 9D supports a finding of ambiguity.

In arguing that the PSA is not ambiguous, seller relies principally on the language in paragraph 12 stating, "Buyer's acceptance of the condition of, and any other matter affecting the Property, is a contingency of this Agreement as specified in this paragraph and paragraph 14B." He argues that paragraph 12 was "clear and there is no other susceptible meaning" than that tenant removal would be included as a "condition" or "other matter affecting the Property," and thus, a contingency. Notably, the other provisions seller cites do not advance his interpretation. Paragraph 11, the "as-is" provision, expressly states that the property will be sold "'as-is' in its present *physical* condition." (Capitalization omitted, emphasis added.) Paragraph 14B details the process for buyer's inspection, repair, and removal of contingencies; it does not refer to possession or tenant removal. These provisions also support a finding of ambiguity, because they support buyer's stated understanding that the PSA distinguished between physical conditions of the property and possession.

Seller contends the court should not have relied on extrinsic evidence because the agreement was integrated. This rule "provides that the terms of a writing intended by the parties as a final expression of their agreement cannot be contradicted by evidence of either a prior agreement or a contemporaneous oral agreement. [Citations.] Further, if the parties intended the writing to be a complete and exclusive statement of the terms of the agreement, its terms cannot be explained or supplemented by evidence of consistent additional terms. [Citations.]" (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 352; Code of Civil Procedure, § 1856.) "If the writing is ambiguous, however, extrinsic evidence of the parties' intention is admissible, provided that the writing is reasonably susceptible of the meaning supported by the extrinsic evidence." (*Singh v. Southland Stone, U.S.A., Inc., supra*, 186 Cal.App.4th at p. 352, citing *Casa Herrera, Inc. v.*

17

*Beydoun* (2004) 32 Cal.4th 336, 343; see also *Burch v. Premier Homes, LLC* (2011) 199 Cal.App.4th 730, 741.)

Here, as we have discussed, the trial court properly looked to extrinsic evidence to explain the ambiguities in the PSA, not to vary or contradict explicit terms of the contract. As such, seller's cases disallowing a party from avoiding or changing a clear and explicit contractual term are inapplicable here. (See, e.g., *Thrifty Payless, Inc. v. Mariners Mile Gateway, LLC* (2010) 185 Cal.App.4th 1050, 1061 ["when a contract is integrated . . . extrinsic evidence cannot be used to vary or contradict the instrument's express terms"]; *Stewart v. Preston Pipeline Inc.* (2005) 134 Cal.App.4th 1565, 1587 [plaintiff "objectively manifested assent" by signing agreement despite later claim he did not read it].) Thus, the trial court did not err in relying on extrinsic evidence in interpreting the PSA.

Turning to the substance of the PSA, we agree with the trial court that the PSA was reasonably susceptible to buyer's interpretation that the definition of "contingency" in paragraph 12 did not apply to the tenant removal provision in paragraph 9. Buyer introduced extrinsic evidence that the parties agreed it was seller's obligation to deliver possession of a vacant property, including buyer's testimony of seller's repeated promises to this effect, the emails from seller expressing this promise, and seller's efforts consistent with this obligation. Indeed, there was no evidence that prior to escrow closing either party believed otherwise. Seller himself testified at length about his concerns that he would not be able to evict Mizerak by closing and his conversations with both buyer and Mizerak on this issue. The only evidence to the contrary was seller's expert's testimony about the understanding of the term in the industry, and seller's testimony that *after* closing, he did not believe he continued to have the duty to evict Mizerak.

Seller attempts to dismiss buyer's testimony about the parties' understanding as "oral statements of hope." He argues there was substantial evidence that, as of a few days before closing, the parties no longer believed it was seller's duty to deliver a vacant property. We will not reweigh the evidence; the only relevant question on appeal is whether substantial evidence supports the trial court's conclusion. The trial court was entitled to rely on buyer's testimony and other evidence of the parties' understanding,

including seller's own conduct and statements he made to buyer and Mizerak. Thus, substantial evidence supports the trial court's finding that throughout the entire transaction, the parties agreed that seller was required to bear the obligation of removing Mizerak. The trial court's interpretation of the contract is reasonable under the circumstances and should not be disturbed on appeal. (*Morey v. Vannucci, supra*, 64 Cal.App.4th at p. 913.)

We also reject seller's contention that the court was required to accept seller's expert's testimony as to the definition of "contingency" under the PSA. It was undisputed that neither party had a licensed real estate professional assisting in the transaction. Seller's contention that it was "proven at trial that Buyer could have, at any time obtained his own real estate agent or attorney but merely was required to pay for him or her on his own" is unsupported by the record and contrary to the trial court's express finding. While seller testified that he told buyer he would have to pay for his own agent if he wanted one, buyer testified that Mizerak told him he could not purchase the house if he used an agent. Because neither party used a real estate agent, it was reasonable for the trial court to find that the expert's testimony as to customary usage of "contingencies" in the real estate industry did not shed any light on the parties' intent or understanding when signing the PSA. The trial court relied on buyer's testimony on this point and we will not reweigh the evidence on appeal. Moreover, it was undisputed that Mizerak prepared the PSA; thus any uncertainty is interpreted against seller, as the "party who caused the uncertainty to exist." (Civ. Code, § 1654.)

## B. *Waiver*

Even assuming that the tenant removal provision in paragraph 9D was a contingency, the trial court found that buyer did not knowingly waive it by signing the amended escrow instructions. Seller contends this was error. We disagree.

"Case law is clear that "[w]aiver is the intentional relinquishment of a known right after knowledge of the facts." [Citations.] The burden . . . is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and "doubtful cases will be decided against a waiver."" (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 31 (*Waller*), quoting *City of Ukiah v. Fones* (1962) 64

Cal.2d 104, 107-108; see also *DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Cafe & Takeout III, Ltd.* (1994) 30 Cal.App.4th 54, 60 ["Waiver always rests upon intent."].) "The waiver may be either express, based on the words of the waiving party, or implied, based on conduct indicating an intent to relinquish the right." (*Waller, supra*, 11 Cal.4th at p. 31, citing *Brookview Condominium Owners' Assn. v. Heltzer Enterprises-Brookview* (1990) 218 Cal.App.3d 502, 513.)

Where, as here, "the trier of fact has expressly or implicitly concluded the party with the burden of proof did not carry the burden and that party appeals, 'it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment. . . . [¶] Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding."'" (*Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838; accord, *In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, overruled on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)

Seller cannot meet this heavy burden. Seller contends that buyer's knowing waiver was manifested by his signing of the amended escrow instructions and his conduct in proceeding to close even though he knew Mizerak was still living at the property. But there was significant evidence supporting the trial court's conclusion that both parties continued to understand and agree that seller would remove Mizerak from the property before the close of escrow on January 15. Buyer explained at trial that he did not take the steps identified by seller, including entering into a lease-back, issuing a notice to perform, and conducting a final walk-through of the property because seller continued to promise that he would ensure Mizerak had moved out by the time escrow closed. Thus, there was evidence presented at trial that buyer did not intentionally waive his right to require seller to deliver a tenant-free property, but rather buyer continued to rely on seller's repeated promises to perform. Because the evidence was neither

20

uncontradicted nor overwhelming in favor of seller, we affirm the trial court's finding that buyer did not waive the tenant removal provision in paragraph 9D and, consequently, its conclusion that seller breached the PSA.

## C. *Damages*

Seller also contends the trial court erred in awarding damages to buyer. First, he argues that buyer failed to mitigate his damages and was not entitled to any recovery. Second, seller asserts that the amount of damages awarded improperly includes the period of the pandemic, which was not a foreseeable part of the parties' agreement. We agree that the court closures caused by the pandemic were not foreseeable and therefore reverse that portion of the damages award.

### 1. *Failure to Mitigate*

"'The doctrine of mitigation of damages holds that "[a] plaintiff who suffers damage as a result of . . . a breach of contract . . . has a duty to take reasonable steps to mitigate those damages and will not be able to recover for any losses which could have been thus avoided."'" (*Agam v. Gavra* (2015) 236 Cal.App.4th 91, 111 (*Agam*), quoting *Valle de Oro Bank v. Gamboa* (1994) 26 Cal.App.4th 1686, 1691.) "Under the doctrine, '[a] plaintiff may not recover for damages avoidable through ordinary care and reasonable exertion.' [Citation.] However, '[t]he duty to mitigate damages does not require an injured party to do what is unreasonable or impracticable.'" (*Agam, supra,* 236 Cal.App.4th at p. 111.)

"Whether a plaintiff acted reasonably to mitigate damages . . . is a factual matter to be determined by the trier of fact." (*Powerhouse Motorsports Group, Inc. v. Yamaha Motor Corp. U.S.A.* (2013) 221 Cal.App.4th 867, 884.) The burden of proving a plaintiff failed to mitigate damages is on the defendant. (*Ibid*.) Because the trial court found that seller did not carry that burden, the question before us is whether the evidence compels a finding in favor of seller as a matter of law. (*Agam, supra,* 236 Cal.App.4th at p.111, citing *Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 465-466; see also *Dreyer's, supra,* 218 Cal.App.4th at p. 838.)

Seller has not established that the evidence compels a finding in his favor on mitigation. He points to acts that buyer could have taken to protect

himself prior to closing, such as "demanding" a lease-back, issuing a notice to perform to seller, conducting a final walk-through, and carving the tenant removal provision out of the amended escrow instructions. But the trial court relied on evidence that buyer did not proceed with the lease-back or issue a notice to perform because of seller's repeated promises that he would remove Mizerak. Indeed, buyer testified that he did not pursue the lease-back at seller's insistence, because seller did not want to delay closing. Similarly, buyer testified that after Mizerak refused to allow him to do the walk-through, he decided he could forgo it because he was fine with the physical condition of the property and understood he was buying it "as is." Finally, because we have affirmed the trial court's findings concerning paragraph 9D, buyer did not need to exempt that paragraph from the amended escrow instructions.

Seller also contends that it was unreasonable for buyer to refuse to allow seller to pay Mizerak $6,000 in buyer's name. We are not persuaded by this argument, which is unsupported by any authority. The trial court was entitled to credit buyer's testimony that he felt Mizerak's conduct was extortion and therefore to find that buyer's refusal was reasonable. Seller also argues that buyer acted unreasonably after closing in failing to timely pursue the unlawful detainer action. Again, the trial court relied on evidence of buyer's efforts, including interviewing other attorneys and initiating proceedings himself, to conclude that buyer acted reasonably. The court did find, however, that it was not reasonable for buyer to delay in hiring counsel for three months after courts had reopened after the pandemic, and reduced the damages award accordingly.[4]

In sum, we conclude that seller did not carry his burden to establish that the evidence was "uncontradicted and unimpeached" regarding buyer's actions in mitigation of his damages. We therefore affirm the trial court's ruling that buyer did not fail to mitigate his damages, with the exception of a three-month delay in hiring new unlawful detainer counsel.

---

[4]     Thus, although seller claims the court found that buyer had no duty to mitigate his damages, in fact, the court found that buyer took reasonable steps in mitigation other than his delay in hiring new counsel.

## 2. *Amount of Damages*

Seller also argues that none of damages incurred in evicting Mizerak were foreseeable when the parties entered into the PSA. We disagree with this contention, with one exception discussed below.

For a breach of contract, Civil Code section 3300 provides that "the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." "Contract damages are generally limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at that time; consequential damages beyond the expectations of the parties are not recoverable [Citations.] This limitation on available damages serves to encourage contractual relations and commercial activity by enabling parties to estimate in advance the financial risks of their enterprise." (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd*. (1994) 7 Cal.4th 503, 515, citing Civ. Code, § 3300; see also *Erlich v. Menezes* (1999) 21 Cal.4th 543, 550.) Thus, damages must be reasonable, and "the promisor is not required to compensate the injured party for injuries that it had no reason to foresee as the probable result of its breach when it made the contract." (*Burnett & Doty Development Co. v. Phillips* (1978) 84 Cal.App.3d 384, 389, citing *Coughlin v. Blair* (1953) 41 Cal.2d 587, 603.)

The determination of whether contract damages are foreseeable is a question of fact governed by the substantial evidence test. (*Ash v. North American Title Co*. (2014) 223 Cal.App.4th 1258, 1268, citing *Plut v. Fireman's Fund Ins. Co*. (2000) 85 Cal.App.4th 98, 105–106; *Garlock Sealing Technologies, LLC v. NAK Sealing Technologies Corp*. (2007) 148 Cal.App.4th 937, 955–956.)

Seller first contends that none of the damages arising from the difficulty in evicting Mizerak were foreseeable, since at the time they signed the PSA both parties believed that Mizerak would leave in a timely manner. We disagree. The PSA expressly contemplated that a failure to deliver the property without a tenant was a breach of contract, and there was substantial evidence presented that the parties understood that buyer

23

intended to move into the property upon closing. Moreover, the trial court cited evidence that as early as July 2019, before the parties signed the PSA, there were indications that Mizerak did not want to leave, as he wanted to use the property for his business. Thus, substantial evidence supported the trial court's conclusion that the possibility of having to evict Mizerak, and incur associated costs (payment of buyer's mortgage and unlawful detainer attorney fees), was foreseeable at the time the parties entered into the PSA.

We also reject seller's second contention that the parties could not have foreseen the more standard delays in finalizing the eviction, such as buyer's failure to proceed with original counsel (Hufford-Cohen) or to immediately hire new counsel after terminating Hufford-Cohen in early 2020. Just as it was foreseeable that an eviction might be required, the trial court did not err in concluding that the parties should have expected that some difficulties and delays in that eviction might arise. There was no evidence establishing, as seller suggests, that even if buyer had proceeded with new counsel immediately after firing Hufford-Cohen, he could have evicted Mizerak by May 2020. We agree with the trial court that seller's contention to the contrary was speculation.

Finally, seller contends that when they signed the PSA in 2019, the parties did not foresee the possibility of extensive delays in the eviction due to the pandemic shutdown in mid-2020. Thus, he argues that buyer is not entitled to recover the mortgage payments he made when the eviction was placed on hold during the shutdown. We conclude that the trial court did not expressly find that the approximately six months of mortgage payments from March to September 2020 were foreseeable costs of the contract, and that substantial evidence would not support that conclusion in any event.

Here, the costs arising out of the pandemic shutdown would qualify as special damages, i.e., "losses that do not arise directly and inevitably from any similar breach of any similar agreement." (*Lewis Jorge Construction Management, Inc. v. Pomona Unified School Dist*. (2004) 34 Cal.4th 960, 968 (*Lewis*).) California follows the rule limiting special damages first articulated in *Hadley v. Baxendale* (1854) 156 Eng.Rep. 145, which provides that special damages are recoverable only if the "particular circumstances from which they arise were actually communicated to or known by the breaching party (a

subjective test) or were matters of which the breaching party should have been aware at the time of contracting (an objective test)." (*Lewis, supra*, 34 Cal.4th at pp. 968-969.)

Buyer contends that the *Hadley* rule only excludes damages where the parties did not or should not have known of an entire category of potential damages, such as lost profits. Here, by contrast, he argues that the parties knew of the potential for damages from delays in evicting Mizerak and he should be able to recover for damages that were "'foreseeable but higher than expected' . . . caused by the brief closing of UD courts." Buyer cites no authority to support his contention that the foreseeability of a general category of damages, such as costs from attempting to evict a tenant, renders all possible damages within that category foreseeable. We are not persuaded that the possibility of months-long court closures from a pandemic was a risk that the parties knew or should have known about when they signed the PSA. The trial court did not specifically address this issue, instead finding more generally that difficulties in evicting Mizerak were foreseeable. Although the court reduced the damages by three months, that reflected a finding that buyer unreasonably delayed in hiring new counsel after the shutdown; the court did not expressly find that the costs incurred during the shutdown were foreseeable. We therefore remand the matter to allow the court to reassess which damages were foreseeable in light of these findings.

## DISPOSITION

The judgment is reversed as to the amount of damages awarded and affirmed in all other respects. The matter is remanded to the trial court for further proceedings. The parties are to bear their own costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, ACTING P. J.

We concur:


MORI, J.                                          ZUKIN, J.